## No. 21691.

THE PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO AND POUDRE VALLEY RURAL ELECTRIC ASSOCIATION, INC. *v.* HOME LIGHT AND POWER COMPANY, AND PUBLIC SERVICE COMPANY OF COLORADO.

(428 P.2d 928)

Decided June 12, 1967. Opinion modified and as modified petition for rehearing denied July 17, 1967.

74

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, ROBERT P. FULLERTON, Assistant, for plaintiff in error The Public Utilities Commission of the State of Colorado.

JOHN A. CROSS, JOHN P. THOMPSON, for plaintiff in error Poudre Valley Rural Electric Association, Inc.

HUGHES and DORSEY, RAYMOND B. DANKS, for defendant in error Home Light and Power Company.

LEE, BRYANS, KELLY & STANSFIELD, BRYANT O'DONNELL, for defendant in error Public Service Company of Colorado.

*En Banc.*

MR. JUSTICE PRINGLE delivered the opinion of the Court.

ON January 15, 1963, Poudre Valley Rural Electric Association filed an application for a Certificate of Public Convenience and Necessity with the Public Utilities Commission of Colorado. Poudre Valley Rural Electric Association also filed a formal complaint against Public Service Company of Colorado and Home Light & Power Company alleging duplication of facilities (substantially in the statutory language, which now appears as C.R.S. 1963, 115-5-1 [2]) and requesting that specific electric service territory be assigned to each of the competing utilities on an exclusive basis.

The parties will be referred to as follows: Poudre

Valley Rural Electric Association as Poudre Valley; Public Service Company of Colorado as Public Service; Home Light & Power Company as Home Light; and the Public Utilities Commission of Colorado as the P.U.C.

Home Light answered Poudre Valley's complaint and filed a counter-application covering a portion of the area sought by Poudre Valley. Public Service also answered the complaint and, by its Amended Protest, challenged the applications filed by both Poudre Valley and Home Light. Public Service sought parts of the territory claimed by each of the two other utilities.

The various applications, complaints, protests and counter-applications were consolidated for hearings. Seven days of hearings were held in March, May and July of 1963. The matter was taken under advisement by the P.U.C., and the parties submitted written briefs in August and September of 1963.

On April 22, 1964, P.U.C. Decision No. 62653 was filed by the P.U.C. The decision divided the disputed service areas among the various participants and in some areas ordered various utilities to cease rendering electric service or to sell lines and facilities to other utilities. Pursuant to C.R.S. 1963, 115-6-15, Home Light and Public Service sought judicial review of the P.U.C. decision in Weld County District Court. On November 17, 1964, the District Court reversed the P.U.C. decision in its entirety without giving any reason therefor. Following denial of motions for new trial, the present writ of error was issued.

Poudre Valley and the P.U.C., the plaintiffs in error in these proceedings, seek reversal of the district court's judgment on the grounds that the P.U.C. decision was correct in all respects and should have been affirmed. Basically, Home Light and Public Service claim that the P.U.C. decision in part exceeded the authority given to the P.U.C. by the statutes of Colorado, and in part constituted an abuse of the authority granted to the P.U.C. We will discuss the P.U.C. decision in terms of

the various types of territory involved and the disposition made of each type by the P.U.C. decision.

Poudre Valley applied for a certificate to render electric service in parts of Weld, Larimer and Boulder Counties. Home Light seeks to serve parts of Weld County, and Public Service seeks parts of all three counties. Each utility protests some or all of the claims of the other two. The area involved in this dispute may be classified generally as follows: (1) areas where there are *no existing* lines of any utility, *no nearby* lines of any utility, and apparently *no present demand* for electric service; (2) areas requested by one of the competing utilities, (and not requested by any other utility) and in which only the utility requesting the territory has any existing or *nearby* lines and is the only utility actually rendering service; (3) areas requested by more than one utility where existing lines of the competing utilities are close to one another, but not intersecting or crossing; (4) areas requested by more than one utility where existing lines are intermingled and crossing; (5) enclaves of territory served predominantly by one utility but surrounded or nearly surrounded by lines of a competing utility. Since the disposition, in the P.U.C. decision, of the various types of areas is somewhat different, we will discuss each type separately.

I.

In part of the overall area in dispute, the P.U.C. found that no utility had any existing lines at all, and no lines close enough to make immediate service practical, necessary or economical. Most of these areas are apparently either uninhabited or so sparsely populated that significant demands for electric service in the near future are unlikely to arise. Most of these areas were sought by Poudre Valley, and by no other utility. The P.U.C. decision generally *excludes* such areas from the certificated territories. This was entirely proper. *Public Util. Comm'n. v. Town of Erie*, 92 Colo. 151, 18 P.2d 906. Since no lines exist in these territories and there ap-

parently is no present demand, the P.U.C. decided that such areas should not be certificated until such time as demand for service makes it economically practical for the utility or utilities near the area to file new applications for certificates. The parts of the P.U.C. decision excluding such areas from the territories to be certificated were correct and should have been affirmed.

 The P.U.C. also *excluded,* from the territory to be certificated to the various competing utilities, a number of areas close to the city limits of various cities, towns and municipalities in the overall area. Some of these excluded areas evidently required no present service, and some were already receiving all necessary service from various municipal power companies. The decision that the public convenience and necessity would best be served by not certificating these areas to anyone at this time was an exercise of the discretion of the P.U.C. We cannot say, from the record before us, that the P.U.C. abused its discretion in such areas, and its order covering such areas should have been affirmed.

II.

 Within the overall territory requested by Poudre Valley, there are many areas where only one of the competing utilities was actually rendering service, or had existing *nearby* lines from which the reasonable future demands of the area might economically be met. It appears that the P.U.C. decision grants each such area to the utility which either is actually rendering service or has lines near enough to serve the area without major extensions from its existing system. This was proper. *Pirie v. Public Util. Comm'n.,* 72 Colo. 65, 209 P.640. The fact of existing lines of only one utility in an area is certainly prima facie proof that that utility is adequately meeting the needs of the area, and the P.U.C. gave proper recognition to this by granting such areas to the utility actually rendering service. Public Service, Home Light, and the dissenting opinion of commissioner Zarlengo all take issue with parts of the

P.U.C. decision covering such areas. The gravamen of the objection is that some of the areas treated in this class really are not now actually being served, and should have been excluded from any certification, (as in the first class of territory discussed above) or that the areas should have been awarded to a different utility. Nevertheless, the P.U.C. has determined that the areas in this second class may best be served in the future by the utility presently rendering actual service or having lines in proximity to the areas. We cannot say that this was an abuse of discretion. Where the line should be drawn between unserved areas too remote to require present certification and unserved areas sufficiently close to existing demands that public convenience and necessity demands present certification is a question which is properly addressed to the expertise of the P.U.C.

"* * * We may not set aside orders based upon findings of fact upon which the evidence is conflicting and we are not at liberty to substitute our judgment for that of the Commission. * * *"

*Ephraim Freightways, Inc. v. Public Util. Comm'n.*, 151 Colo. 596, 380 P.2d 228. It does not appear that the P.U.C. abused its discretion in the type of areas discussed in this second category, and the parts of the decision covering such areas should have been affirmed.

III.

The third category of territory involves areas where existing lines of more than one utility are in the area, but where such lines do not actually meet or cross one another. The general effect of the P.U.C. decision in such areas was to divide the remaining territory between the competing lines so as to preserve the status quo. (Where lines enter a section of land from opposite sides, the decision generally divides the section in half. Where one company's lines had entered three out of four of the quarter sections and a line of a second utility

had entered the fourth quarter section, the section was divided on that basis, etc.)

█ Public Service and Home Light take the position that such territories should have been certificated exclusively to them since they were generally first in such overall areas in point of time. They argue that Poudre Valley was only enabled to enter such areas without opposition because Poudre Valley did not become a public utility, and so was not subject to regulation by the P.U.C., until the passage in 1961 of what is now C.R.S. 1963, 115-1-3(2). The P.U.C. and Poudre Valley contend that Poudre Valley did nothing illegal in building lines into these uncertificated territories prior to 1961, and that since Poudre Valley is *now* a public utility it stands on an equal footing with all other public utilities offering electric service in the area. With this latter position we generally agree.

█ We have already held that a rural electric association may not expect to have a service area carved out for it from areas already *certificated* to other utilities. *Public Serv. Co. v. Public Util. Comm'n.*, 142 Colo. 135, 350 P.2d 543, *cert denied,* 364 U.S. 820, 81 S.Ct. 53, 5 L.Ed.2d 50. In such areas "it must find its place from among the places that remain." In the instant case, however, we are talking about "the places that remain." While Poudre Valley should properly be limited to serving its then members and customers in *prior certificated areas,* yet, as to unserved and uncertificated areas it now stands on the same footing as any other public utility. *Public Util. Comm'n. v. City of Loveland,* 87 Colo. 556, 289 P. 1090. A utility having a prior certificate covering a neighboring territory has the legal authority to expand into unserved and uncertificated territory. It appears, however, that the P.U.C. took this expansion authority into account along with all of the other factors involved and we cannot say that it abused its discretion in this regard. As to the category of territory now being discussed, the P.U.C. has divided the

areas in an attempt to allow each utility to maintain its present customers and to have its fair share of any expansion room that still remains. While this may not be entirely satisfactory to all the parties, it was not an abuse of discretion. *Ephraim Freightways, Inc. v. Public Util. Comm'n., supra.* The parts of the P.U.C. decision covering areas where the existing electric lines are not actually intermingled or crossing should have been affirmed.

### IV.

The most confusing and complicated parts of the territory in question are the areas where the electric lines of more than one competing utility are intermingled. In parts of these areas competing lines cross one another, run closely parallel to one another, or are hopelessly intermingled. The P.U.C. decision seems to have awarded each such area to the utility having the most existing service in the area (what might be called the "predominant" utility.) Having decided to whom each area should be certificated, the P.U.C. decision then utilizes three different solutions for handling the lines of the *non-certificated* utilities in these areas: (1) Some of the lines were allowed to remain and the non-certificated utility was allowed to continue to serve its then existing customers. All new customers were to be served by the certificated utility, and if either (a) a change of the *service* being rendered, or (b) a change of *ownership* of the property served by the non-certificated utility should occur, then the certificated utility would take over serving that customer. (2) Service on some of the lines was ordered to be discontinued immediately. The non-certificated utility might then, at its option: (a) retain the lines in place for transmission and feeder purposes, or (b) remove the lines for salvage purposes, or (c) sell the lines to the certificated utility at "net book" value. (The P.U.C. decision defined "net book" value as original cost less claimed depreciation — as shown by the books of the utility concerned.) (3) Some

of the lines were ordered to be sold immediately to the certificated utility at "net book" value. We must first decide whether the initial decision to award each such area was correct, and if so, whether the various methods of disposing of the lines belonging to non-certificated utilities were correct.

This Court has held that where a utility not subject to regulation by the P.U.C. builds lines into an area which is already completely and adequately served by another utility, the intruding utility may not later, upon becoming subject to regulation, claim the territory as its own. *Public Serv. Co. v. Public Util. Comm'n., supra.* The P.U.C. evidently did not determine whether there were any areas which fall under the rule just stated. If there are areas which were already *completely and adequately* served (even though not certificated) by other utilities at the time Poudre Valley built its lines into such areas, then Poudre Valley should now be limited to serving its *existing customers* in such areas, in accord with *Public Serv. Co. v. Public Util. Comm'n., supra.* It is probable that there are some areas which fall into this category, but the actual delineation of such areas must be left to the P.U.C. In addition, there certainly will be some areas where lines are *now intermingled,* but which were "* * * not theretofore served by a public utility providing the same commodity or service, * * *" C.R.S. 1963, 115-5-1(1), *at the time when the lines were built.* As to such areas, the P.U.C. correctly held that one utility may now be certificated to serve on an exclusive basis. The determination of which areas fall into this latter class must be left to the P.U.C.

This brings us to a consideration of the three basic methods used by the P.U.C. to deal with the lines of *non-certificated* utilities running into territory to be certificated exclusively to other utilities. The first method used by the P.U.C. was what may be called "freezing" of the intruding lines. Under this solution, the non-certificated utility was limited to serving its

*existing customers* on the line in question. All new customers were to be served by the certificated utility. The P.U.C. also desired to provide for the gradual elimination of these "frozen" service lines. In order to do this, the decision provided that when a change of *service* or of *ownership* occurred with regard to property served from such lines, the non-certificated utility would cease rendering service and turn the customer over to the certificated utility. The decision to order these lines frozen was within the discretionary authority of the P.U.C. granted by C.R.S. 1963, 115-15-1. *Public Serv. Co. v. Public Util. Comm'n., supra.* It was also (to use the words of the statute) "just and reasonable" to order that the non-certificated utility cede customers to the certificated utility upon a change in the *nature of the service* being rendered. However, we are unable to see what logic compels a change of the utility rendering service when a mere change of *record ownership* of the property being served occurs. The change of ownership may also entail a change in the *nature* of the service rendered, but change in the *ownership,* without more, is not a sufficient basis on which to order discontinuance of service.

The second method used to deal with lines of non-certificated utilities intruding into areas to be certificated to others was to order immediate cessation of service on the line. The parts of the decision which utilized this method provided that the utility which was ordered to discontinue service could then, at its option, (a) retain the line for transmission and feeder purposes, or (b) remove the line, or (c) sell the line to the newly certificated utility at "net book" value.

This second method is, as used, objectionable. These lines apparently were built at a time when the territory was not certificated and so was open for extensions made by any of the utilities. The public interest would best be served by an order freezing most of these lines in accord with the method discussed above.

If the P.U.C. finds that the continued maintenance of some of the individual lines will *prevent* the certificated utility from providing adequate service in the area, then as to such lines an order for discontinuance of service might be reasonable. *Public Serv. Co. v. Public Util. Comm'n., supra.* The delineation of which lines are *so objectionable* as to require discontinuance and which lines merely require freezing should be made by the P.U.C.

■■ As to the parts of the decision which provide for immediate sale of facilities by the non-certificated utilities at "net book" value, these portions must be disapproved. The P.U.C., as we have said, may order the lines frozen. But to order the sale of facilities would constitute a taking of property without just compensation. See, *Chicago, B. & Q. R.R. v. Public Util. Comm'n.,* 69 Colo. 275, 193 P.726. The P.U.C. may well indicate to the parties what it feels would be a fair price should a negotiated sale of such facilities take place. But whether a sale will take place and the actual sale price are subjects for negotiation between the parties. At several points in its decision, the P.U.C. indicates that it will "look with favor" upon negotiations leading to the elimination of certain facilities. This is entirely proper encouragement, but an outright order to sell cannot be sustained. If negotiated sales of facilities are made at *unreasonable* prices, the P.U.C. may well choose to refuse its approval of the sale, but it may not order a sale or fix the sale price before the negotiations have even begun.

V.

■■ In at least one area, the "North and South Kersey Enclaves," the P.U.C. was faced with territory served almost exclusively by one utility and yet almost completely surrounded by the lines of another utility. The P.U.C. chose to certificate the enclaves to the utility actually rendering service in the enclaves and to certificate the surrounding territory to the utility actually

rendering service there. This was within the discretion of the P.U.C. Subject to what we have said about the disposition of intruding lines of non-certificated utilities, we hold that the decision to divide this territory so as to preserve these enclaves was a factual determination as to what would best serve the public interest in the areas, and we cannot say that the solution was an abuse of discretion.

## VI.

Several miscellaneous problems remain which cannot be classified according to the type of territory involved. The P.U.C. decision provided at numerous points that when a non-certificated utility ceased rendering service to an individual customer and ceded that customer to the certificated utility, the change of service should be accomplished without any additional extension or connection charge to the customer. This was just and reasonable. There would seem to be no logical basis for requiring the customer to pay for a change of the utility which is rendering service when the customer did not request the change and apparently gains no additional service or benefit from the change.

The P.U.C. decision also provided that nothing in the decision should be construed to prevent a utility from building or maintaining transmission facilities and substations necessary for its overall system, no matter where located. Such facilities were allowed to be built or retained so long as electric power is not distributed from such transmission facilities to customers within territory certificated to another utility. This was reasonable. However, the P.U.C. also noted that the transmission facilities of Public Service generally followed the existing railroad rights-of-way in the entire area. These railroad rights-of-way are likely places for the future development of large industrial loads, and the P.U.C. decision stated that Public Service would have the right to apply to serve any future large industrial loads bordering its transmission facilities even

though arising in territory to be certificated to other utilities. The P.U.C. may mean no more by this statement than to state that Public Service Company (or any other utility) may apply to serve a user who cannot be adequately served by the utility certificated to serve the area. But we feel constrained to note that once an area has been *certificated* to one utility, it and it alone has the right to serve the future needs of that area provided it can do so. This is essential to the doctrine of regulated monopoly in Colorado. See, *Colorado Transp. Co. v. Public Util. Comm'n.*, 158 Colo. 136, 405 P.2d 682. This does not mean, however, that Public Service (or any other utility) may not seek to serve the user if it appears in the future that a certificated utility is either *unwilling* or *unable* to serve any existing or newly developing load (industrial or otherwise) within its certificated territory at rates approved by the P.U.C. See, *Denver & R.G.W.R.R. v. Public Util. Comm'n.*, 142 Colo. 400, 351 P.2d 278.

The judgment of the district court is reversed and the cause remanded to the district court with directions to refer the matter back to the P.U.C. to amend its order in conformity with the views expressed herein, and if it deems such necessary, to hold further evidentiary hearings.