**O'BRIEN COUNTY RURAL ELECTRIC COOPERATIVE, Appellant,**

v.

**IOWA STATE COMMERCE COMMISSION, Appellee,**

and

**Iowa Public Service Company, Intervenor.**

No. 83–1199.

Supreme Court of Iowa.

June 13, 1984.

John T. Ward and Kerry Anderson of Wasker, Sullivan & Ward, Des Moines, for appellant.

Philip E. Stoffregen, General Counsel, Des Moines, Patrick J. Nugent, Deputy Counsel, and Diane Munns and William A. Haas, Asst. General Counsel, Des Moines, for appellee Iowa State Commerce Commission.

Suzan M. Stewart and Ira E. Delk, Sioux City, for intervenor Iowa Public Service Company.

Considered by McCORMICK, P.J., and McGIVERIN, LARSON, SCHULTZ, and WOLLE, JJ.

LARSON, Justice.

In a complaint filed with the Iowa State Commerce Commission, Iowa Public Service Company (IPS) challenged the right of the O'Brien County Rural Electric Cooperative (O'Brien) to provide electrical service for a rural water district which included land in the "assigned service areas" (Iowa Code § 476.25) of both IPS and O'Brien.

A hearing examiner for the commission sustained that objection, ruling that IPS was entitled to serve the water district. O'Brien appealed to the full commission, which affirmed the ruling of the hearing examiner. Applying a "geographic load center" test, the commission concluded a proposed usage of electricity by the water district was concentrated in the area of service assigned to IPS. The commission refused to consider O'Brien's evidence regarding a possible change from one existing well to another proposed well. This potential effect on the geographic load center test, it concluded, was too speculative. It also ordered O'Brien to abandon its line which it had constructed to serve this customer, concluding that the line had been illegally constructed without a franchise.

O'Brien sought judicial review, and IPS intervened on the side of the commission. Upon the district court's affirmance of the commission order, O'Brien appealed to this court.[1] We affirm.

The facts are basically undisputed. The prospective customer, the Osceola Rural Water System (Osceola), had developed a well field consisting of four wells. Two

1. The district court ruled that the commission erred in failing to consider the impact of the change from one well to another but found no resulting prejudice to O'Brien. The district court, therefore, affirmed the commission's order.

wells, numbered one and two, were located within the exclusive service area assigned by the commission to IPS and were equipped with thirty-horsepower electric motors. One well, number four, was located within the exclusive service area of O'Brien. Well number three was located directly on the service area boundary of the two utilities. Wells three and four were equipped with twenty-horsepower motors. Each of the four motors was expected to operate eight hours per day. The proposed "point of delivery" where electric service was to be taken by the customer was also located within O'Brien's assigned service area.

There was evidence before the hearing examiner that well number three might be abandoned, and a new well, number five, constructed within O'Brien's service area. At the time of the hearing, however, no final decision had been made. O'Brien had only obtained an exploration lease and an option to purchase the fifth well site and had drilled a test well.

On July 23, 1981, O'Brien applied to the commission for a franchise, under Iowa Code section 478.1, to construct a transmission line to the field. On July 31, the water district filed a formal application for service with O'Brien.

IPS objected to the franchise application in October, 1981, and in April, 1982, O'Brien withdrew the application. On May 3, 1982, IPS filed, with the commission, the "territory complaint" which began this proceeding. Later that month, O'Brien responded to the complaint and also began constructing a line to the well field without a franchise.

As of the date of the initial hearing on IPS's complaint, July 12, 1982, the line had been completed. Except for one crossing of a county road, the line was built on private right-of-way.

On appeal, O'Brien argues that (1) Iowa Code section 476.23(2), not section 476.25, must govern resolution of this boundary dispute; (2) it was not required to obtain a franchise to construct the transmission line; (3) the commission acted improperly in applying its "geographic load test" to resolve the conflict; and (4) failure of the commission to consider evidence of the proposed new well requires reversal. It also asserts generally that the commission action was arbitrary, capricious, or characterized by an abuse of discretion, and unsupported by substantial evidence. *See* Iowa Code §§ 17A.19(8)(f), (g).

I. *Which Statute Applies?*

Our initial question is which statute, Iowa Code section 476.23(2) or 476.25, governs the resolution of electric service disputes involving prospective customers located in more than one service area.

O'Brien relies on this language of section 476.23(2):

An electric utility shall not construct or extend facilities or furnish electric service to a prospective customer not presently being served, unless its existing service facilities are nearer the proposed point of delivery than the service facilities of any other utility.

Because it is undisputed that the proposed point of delivery is in O'Brien's assigned territory, it argues that IPS is prohibited by this section from extending its line to serve the well field. It relies on *Nishnabotna Valley Rural Electric Cooperative v. Iowa Power and Light Company*, 161 N.W.2d 348 (Iowa 1968), which held that the point of delivery, not the geographic load center, was the determinative factor under that section.

IPS, however, relies on an exception to the point of delivery test enacted after *Nishnabotna* as an amendment to section 476.23(2). This language was added:

This subsection shall not apply if the prospective customers are within an exclusive service area assigned to an electric utility as provided in this division.

O'Brien claims that the exception created in the last sentence of section 476.23(2) does not apply because the "an" means one, and Osceola is within two service areas.

■ The commission interpreted the exclusionary sentence of section 476.23(2) to apply in cases such as this where a proposed customer spans more than one assigned service area. It therefore concluded the "point of delivery" test under section 476.23(2) was not mandated, leaving the commission free to settle the dispute on some other basis. In this case, it chose to apply the geographic load center test. While the commission's interpretation of a statute is not binding on the court, it is entitled to be given weight in our analysis. *See Hiserote Homes, Inc. v. Riedemann,* 277 N.W.2d 911, 913 (Iowa 1979); *West Des Moines Education Association v. PERB,* 266 N.W.2d 118, 124 (Iowa 1978). In the instant case, we agree with the commission's interpretation.

Paraphrasing section 476.23(2), the "point of delivery" test simply means that a utility may not ordinarily service a new customer if another utility has a line closer to the customer's "point of delivery." We have said the "point of delivery" has ordinary meaning, that is, "the point at which the customer proposes to take delivery of the merchandise; in this case, electricity." *Nishnabotna,* 161 N.W.2d at 352.

While simple to define, and presumably easy to administer, the point of delivery test has its drawbacks. As we noted in *Nishnabotna,* this approach allows a customer to choose one utility over another by strategically locating its point of delivery. The commission noted this problem in an earlier proceeding in which it quoted with approval this argument favoring the application of a geographic load center test in lieu of the point of delivery test:

> Carried to the extreme, [under the point of delivery test], an industrial or commercial customer located many miles within the service territory of a utility could run a primary extension to the boundary line at which point service could be taken from another utility.

*In re Establishment of Service Territory Boundaries Between Iowa Electric Light and Power Co. and D.E.K. Rural Electric Cooperative,* docket number SPU—79—11, P. 7 (Iowa State Commerce Commission, May 13, 1981).

Competition in any field may be said to be healthy. Extending customer lines to an artificial point of delivery, however, has other implications. As noted by the commission, the goal of planned electrical distribution is to obtain the most economical system for customers of all utilities. The legislature has determined that this is best accomplished through the area-designation scheme of section 476.25. For reasons discussed later, O'Brien's interpretation of 476.23(2), which would leave the point of delivery test intact in any case where a customer spanned more than one utility's designated area, would seriously erode that scheme.

The commission also noted in the earlier case that adherence to the point of delivery test would lead to other, more pragmatic problems: "[A]rtificial customer points of delivery will proliferate thousands of yards of customer maintained facilities over which the [commission] has no service or safety review." *In re Establishment of Service Territory, supra,* at 7.

O'Brien argues that section 476.23(2) is clear and that there is no need to resort to interpretation or construction. It points out that section 476.25 only states general policy and never mentions the resolution of a conflict such as we have here. Even if section 476.23(2) is found to be ambiguous, O'Brien argues, its interpretation should prevail because otherwise the first sentence would be meaningless.

The argument presented by the commission and IPS seeks to place each of these sections in its legislative and historical context. Section 476.23 and its predecessor have been law for many years. In 1976, the legislature passed a comprehensive law seeking to coordinate electric service. Section 476.25, providing for the establishment of exclusive service areas, was part of that bill, as was the new last sentence of section 476.23(2), which excluded customers in designated areas from mandatory application of the point of delivery test. Thus the commission and IPS argue that section

476.25 controls under the amended statute but that 476.23(2) was left in effect to cover those areas not yet under a commission designated exclusive service area. (At the time of this hearing, approximately 90 percent of the state was so designated).

The construction of section 476.23(2) sought by O'Brien, *i.e.*, that the point of delivery test is mandated by that section because the potential customer is situated in two, rather than one, designated areas would not further the policy enunciated in section 476.25 which is to "encourage the development of coordinated statewide electric service ..., to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public." It would, in fact, exacerbate the problem of instability and territory lines which accompanied the earlier point of delivery test. A potential customer desiring to "jump" territories by designating an artificial point of delivery would only have to create an artificial usage in another district, making it a multi-area customer and, under O'Brien's theory, entitled to rely on the point of delivery test. (There is no claim here that the usage in O'Brien's territory, or the proposed point of delivery, were artificially created. We make the point merely to show the possible effect of O'Brien's interpretation of that section.)

It is true, as O'Brien points out, that in *Nishnabotna* we refused to recognize an alternative to the point of delivery approach. The statute at that time, however, did not provide any exception such as now found in section 476.23(2). In fact, there was no statutory provision for designated service areas at all; that amendment did not appear until 1976. As of the 1976 amendment, the emphasis changed from that of customer preference to a territorial concept as now apparent in section 476.-23(2) and section 476.25. We note, along the same line, that even the language of section 476.23(2) originally providing for exceptions to the point of delivery test after giving "due consideration of the *preference of the customer*," Iowa Code section 490A.24 (1966), has now been abandoned to

require "due consideration *to the prevention of unnecessary duplication of facilities*." Iowa Code section 476.23(2) (1983) (emphasis added.)

We conclude that the exception provided by the last sentence of section 476.-23(2) for a customer in "an exclusive service area" applies whether the customer is located in one, or more than one, territory. The policy arguments favoring a territorial approach are just as pertinent in the multi-area customer case as they are in that of the single-area customer.

## II. *The Geographic Load Test.*

Having determined that the point of delivery test is not mandated by section 476.-23(2), the question remains what test should be used to resolve this controversy. O'Brien argues that even if the point of delivery test is not mandated by section 476.23(2), it is nevertheless the proper test to be applied here. Adoption of the geographic load center test, it argues, exceeded the commission's statutory authority, Iowa Code section 17A.19(8)(b), and prejudiced substantial rights of O'Brien. The commission and IPS argue, on the other hand, that since no particular test is required by statute, the commission has latitude in the exercise of its discretion to apply the geographic load center test.

The geographic load test was defined in *Nishnabotna* as "a theoretical point determined by giving consideration to 'the location of the permanent electric loads which have been or which will be installed within a reasonable time as part of existing plans.'" 161 N.W.2d at 352. It was characterized as "highly technical," in contrast to the "point of delivery" test said to be a phrase of ordinary meaning. *Id.*

While its exact computation might well be quite technical, the effect of the geographic load center test is simply to locate the electrical usage where it is primarily concentrated—not where a potential customer might locate its point of delivery. The problems inherent in settling border

disputes on the latter method have already been discussed.

The commission argues that application of a geographic load center test best effectuates the policies of section 476.25 which is "to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public." *Id.* It contends that application of this test is a rational exercise of its authority granted by statute to carry out that policy:

In order to effect that public interest, the commission may establish service areas within which specified electric utilities shall provide electric service to customers on an exclusive basis.... However, those boundaries may be modified by the commission to promote the public interest, to preserve existing service areas and electric utilities' rights to serve existing customers, and to prevent unnecessary duplication of facilities, to take account of natural and physical barriers which would make electric service beyond these barriers uneconomic and impractical....

Iowa Code § 476.25.

The commission in this case concluded an application of this test "would best ensure the territorial integrity concept of § 476.25, would eliminate customer redesignation of points of delivery calculated to achieve customers' short-term interests, and would reduce, if not eliminate, opportunities for territory conflicts."

■ While O'Brien claims to have been caught unaware by application of the load center test by the commission, we note that this test was applied in the 1981 *D.E.K. Rural Electric Cooperative* case previously discussed, and the same rationale was used. Docket number SPU—79—11, p. 6. We believe this is rational reasoning and a proper exercise of the powers and expertise of the commission. *See Iowa Health Systems Agency, Inc. v. Wade*, 327 N.W.2d 732, 733 (Iowa 1982).

■ O'Brien argues that, even if the geographic load center test is proper, the commission erred in refusing to consider the possibility of well number five being used when making the load center computation. We agree with the commission that, as of the time of the hearing, this development was only speculative. The water district did not own the land; it merely had an option on it. No permanent well had been dug. It was not even determined what the electrical requirements of the new well would be because the horsepower size of the motor was still undecided.

The commission did not abuse its discretion in refusing to consider this evidence. In determining the geographic load center of the customer, it is necessary to have more definite information as to the needs of the customer. By inserting speculative needs into the load formula, the customer could create an artificial load center just as it has been possible in the past to create an artificial point of delivery to seek out a preferred utility. There was no evidence of such effort here, but this possibility must be considered.

In *Nishnabotna*, we described the center of electrical distribution as that point determined by the location of "permanent electric loads *which have been or will be* installed within a reasonable time as part of existing plans." 161 N.W.2d at 352. (Emphasis added.)

While the district court disagreed with the commission's refusal to consider this evidence, it held that O'Brien had not been prejudiced, because even if well number five had been considered, the geographic load center test would, nevertheless, mandate service by IPS. We affirm, but on the ground the evidence was properly excluded in the first place.

III. *Legality of O'Brien's Transmission Line.*

The commission also decided, and the district court agreed, that O'Brien's construction of a transmission line across a

county road without a franchise was illegal. It therefore refused to consider it when making the decision as to which utility should serve Osceola.

The commission and IPS rely on Iowa Code section 478.1, which requires a franchise from the commission for constructing "any transmission line, wire, or cable along, over, or across any public highway...."

O'Brien claims it is excepted from that section by section 478.30, which provides:

Nothing in this chapter shall prevent any such individual or corporation having its high tension line on its own private right of way on both sides of any highway, from crossing such public highway under such rules and regulations as the state commerce commission may prescribe, and subject from time to time to legislative control as to duration and use.

The commission responds that section 478.30 applies only to a situation where a utility already has lines on both sides of the road and merely wants to connect them. IPS cites a prior commission statement of this interpretation and asks that we give this interpretation some deference.

While this is an interesting issue, we need not decide it here, because even if the line's existence had been considered by the commission, it would not change the geographic load center, which does not take such factors into consideration. We have already concluded that this test was properly applied and the center found to be in IPS's territory.

O'Brien, however, relies upon the general policy of chapter 476 which is to minimize duplication of lines. According to its argument, it would be violative of that policy for the commission to allow IPS to construct a line to serve Osceola when there is already one in existence. In other words, the commission was not bound to apply the geographic load center test if another approach would more effectively advance the policy of the statute.

■ On the other hand, we note that O'Brien did not even begin construction of the line to the well field until well after it knew there was a dispute over the border rights. Aside from the question of the legality of such a line, we do not believe a utility should be permitted to build a line under these circumstances into an area in dispute, especially when information then available would indicate a geographic load center would actually be located in another's territory, then claim duplication of facilities as an overriding policy consideration. While we do not necessarily agree with the commission and the district court in concluding the line was illegally constructed, we believe it was properly disregarded in resolving the dispute.

IV. *Substantial Evidence and Abuse of Discretion Arguments.*

O'Brien's final appeal points, substantial evidence and "arbitrary, capricious, or characterized by an abuse of discretion," are wholly based on the questions raised above. For example, if the line was not illegally constructed (Issue III), then its existence should have been taken into account in choosing between the two utilities. Thus, the outcomes above largely, if not totally, determine the posture of these questions.

The commission reemphasizes here the character of this court's review in the case, noting that "[w]hen we [supreme court] examine the district court's review of administrative action we ask only whether the district court correctly applied the law. [Citation omitted.]" *Osborne v. Iowa Natural Resources Council*, 336 N.W.2d 745, 748 (Iowa 1983). An agency's findings are conclusive on appeal if supported by sub-

stantial evidence. Iowa Code § 17A.19 (8)(f). We also are again reminded that some deference is due the agency's expertise in construing the statutes it administers. *West Des Moines Education Association*, 266 N.W.2d at 124.

As indicated above, there is substantial evidence supporting the commission and district court here. The resulting order was not arbitrary, capricious, or characterized by an abuse of discretion.

AFFIRMED.

All Justices concur except SCHULTZ, J., who dissents.