The PUBLIC SERVICE COMPANY OF COLORADO, a Colorado corporation; and Morning Fresh Farms, Inc., a Colorado corporation, Petitioners–Appellees,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO; and Edythe S. Miller, Andra Schmidt and Ronald L. Lehr; and Union Rural Electric Association, Inc., a Colorado corporation, Respondents–Appellants.

No. 86SA461.

Supreme Court of Colorado, En Banc.

Dec. 5, 1988.

Kenneth V. Reif, Kelly, Stansfield & O'Donnell, Denver, for petitioner-appellee Public Service Co. of Colorado.

Pamela A. Shaddock, Harlan C. Stientjes, Stientjes & Shaddock, Greeley, for petitioner-appellee Morning Fresh Farms, Inc.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mark A. Davidson, Asst. Atty. Gen., Regulatory Law Section, Eugene C. Cavaliere, Deputy Atty. Gen., Mark W. Gerganoff, Asst. Atty. Gen., Denver, for respondent-appellant Public Utilities Com'n of Colorado.

Walker Miller, Julie Coy, Greeley, for respondent-appellant Union Rural Elec. Assn.

Randolph W. Starr, Loveland, for amicus curiae Poudre Valley Elec. Ass'n, Inc.

John J. Conway, Denver, for amicus curiae Colorado Rural Elec. Assn.

ROVIRA, Justice.

This is an appeal by Union Rural Electric Association, Inc. (Union) and the Public

Utilities Commission of Colorado (PUC) from a judgment of the Denver District Court which reversed a PUC decision prohibiting Public Service Company of Colorado (Public Service) from providing electricity to facilities located in Union's exclusive area of service. We reverse the judgment of the district court and remand with directions to reinstate the PUC decision.

## I.

This dispute concerns the rights of two territorially certificated public utilities when a customer's facilities are located in both of their exclusive service areas. Morning Fresh Farms, Inc. (Morning Fresh) is an egg, pullet, and poultry waste production facility located on a half-section of land in Weld County, Colorado. The northern two-thirds of the land occupied by Morning Fresh lies within Public Service's exclusive service territory, and the southern one-third lies within Union's certificated territory. Both Union and Public Service have the exclusive right to serve those facilities located within their respective service areas.

Prior to May 18, 1984, Morning Fresh received electrical service from both Public Service and Union. A feed mill, three brooder houses, and two residences were located in Union's service area, and thus were served by Union. Morning Fresh's remaining facilities, consisting of twenty-three egg laying houses, a dried poultry waste fertilizer plant, and several residences were situated in Public Service's certificated area, and thus were served by Public Service. Several of the egg laying houses extended into Union's exclusive territory, but because they were interconnected with the laying houses in Public Service's territory, Union did not dispute Public Service's right to provide them with electricity.

In order to receive more favorable rates, Morning Fresh constructed an electric distribution system which integrated all of its buildings and facilities into a single system. As a result, Public Service now provides all

electricity to Morning Fresh at a point within Public Service's exclusive service territory, and Morning Fresh distributes this electricity to its buildings, including those facilities previously served by Union.

Union filed a formal complaint with the PUC, alleging that Public Service was unlawfully interfering with its exclusive right to serve its customers within its certificated territory, and that Public Service's actions violated a prior agreement of the parties which was incorporated into PUC Decision No. 63322. Public Service denied the allegations, contending that it properly delivered electricity to a customer within its exclusive service territory, and that it could not control what the customer did with the electricity after delivery. Morning Fresh filed a petition to intervene, which was granted.

After a hearing, the PUC hearing examiner issued a recommended decision which concluded that Union's complaint should be dismissed. The hearing examiner considered three tests which have been used to determine the legality of service by a particular utility when a customer's facilities lie within two exclusive service areas: the point of service test, the geographic load center test, and the point of use test. Applying the geographic load center test, he concluded that Public Service was the appropriate utility to provide electricity to Morning Fresh.

The PUC rejected the recommended decision, concluding that the point of use test was required in order to be consistent with the doctrine of regulated monopoly under the facts of this case. The PUC ordered Public Service to cease and desist providing electric service to Morning Fresh's facilities located in Union's certificated territory. After exhausting their administrative remedies, Public Service sought review by the Denver District Court and Morning Fresh sought review in the Weld County District Court. The proceedings were consolidated in the Denver District Court by agreement of the parties.[1]

1. Morning Fresh also brought a suit in Weld County District Court for declaratory judgment, injunctive relief and damages against the PUC,

Public Service, Union, and Duane L. Woodard, Attorney General of Colorado. The district court dismissed the action and the court of

The district court reversed the PUC decision. The court first noted that the PUC made no finding of agency, collusion, or subterfuge as to either Public Service or Morning Fresh. The court acknowledged that the doctrine of regulated monopoly applied to the controversy, but concluded that the PUC erroneously applied Colorado law in holding that the doctrine of regulated monopoly compelled adoption of the point of use test. The court found that the other tests, based upon the record in this case, did not result in increased duplication, subterfuge, or the other evils sought to be controlled by the doctrine of regulated monopoly, and thus the point of use test was not required by law.

The district court also found that the PUC's decision to apply the point of use test was inconsistent with its acquiescence to Public Service's provision of electricity to those egg laying houses located within Union's service territory. The court held that the findings were fatally inconsistent and must be set aside.

Finally, the court found that although the PUC decision was couched in terms of ordering Public Service to discontinue service to Morning Fresh facilities in Union's territory, the effect of the order was to require Morning Fresh to rework its distribution system. The court concluded that this result was flawed for two reasons:

[F]irst it is an unlawful attempt by the Commission to assert subject matter jurisdiction over Morning Fresh, a non-utility corporation; and, second, it deprives Morning Fresh of ... the protections of due process of law in acquiring, using and disposing of [its] property. Morning Fresh had no notice, nor could it have any notice, of the Commission's policy in this regard. No regulation had been formulated, nor did any statute exist to cover this situation at the time Morning Fresh installed its system.

We believe the district court improperly substituted its judgment for that of the PUC in deciding which test should be used to measure Public Service's actions, and erred in holding that the PUC improperly asserted subject matter jurisdiction and denied Morning Fresh its constitutional rights.

II.

Considerable discretion is vested in the PUC in order to carry out its legislative functions and the scope of judicial review is limited. Section 40–6–115(2)–(3), 17 C.R.S. (1984), provides:

(2) The findings and conclusions of the commission on disputed questions of fact shall be final and shall not be subject to review, except that, in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of a petitioner under the constitution of the United States or the constitution of the state of Colorado, the district court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the said constitutional question shall not be final.

(3) Upon review, the district court shall enter judgment either affirming, setting aside, or modifying the decision of the commission. So far as necessary to the decision and where presented, the district court shall decide all relevant questions of law and interpret all relevant constitutional and statutory provisions. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

appeals affirmed. It held that Morning Fresh had no independent right of action against the defendants because section 40–6–115, 17 C.R.S. (1984), provides the exclusive remedy for a par- ty to a proceeding before the PUC to seek review of a commission decision. *Morning Fresh Farms, Inc. v. Public Utils. Comm'n,* No. 86CA1190 (Colo.App. April 21, 1988).

Because Morning Fresh alleges that the PUC decision unconstitutionally deprived it of property without due process of law, the district court was required to "exercise an independent judgment on the law and the facts." In doing so, however, the district court was required to recognize that the actions of the PUC are presumed to be regular and will be upheld absent clear evidence to the contrary. *GTE Sprint Communications Corp. v. Public Utils. Comm'n*, 753 P.2d 212 (Colo.1988). Moreover, the exercise of discretion and judgment should not be interfered with by the reviewing court. "We adhere to the proposition that the legislature contemplated that the reviewing court, since it does not have the aid of a staff and the expertise of the PUC, should not undertake to duplicate the evaluation and judgment processes followed by the PUC in arriving at its decision." *Atchison, Topeka & Santa Fe Ry. v. Public Utils. Comm'n*, 194 Colo. 263, 267, 572 P.2d 138, 141 (1977).

### A.

■ Union and the PUC contend that the trial court erred in reversing the PUC determination that the point of use test should be used under the circumstances of this case. We agree.

■ Jurisdictions which have considered the situation where a single customer has facilities located within the exclusive territory of two adjoining utilities have adopted one of three tests to determine which utility may properly provide service to that customer. The point of service test focuses on the point at which electricity is delivered rather than on the point at which it is consumed. If a utility provides electricity to a customer within its certificated territory, the sale is proper, even if the customer transports the electricity into the certificated territory of another utility for the customer's use. *See Nishnabotna Valley Rural Elec. Coop. v. Iowa Power & Light Co.*, 161 N.W.2d 348 (Iowa 1968). *See also New Ipswich Elec. Lighting Dept. v. Greenville Elec. Lighting Co.*, 108 N.H. 338, 235 A.2d 833 (1967).

The geographic load center test is defined as "a theoretical point determined by giving consideration to the location of the permanent electric loads which have been or which will be installed within a reasonable time as part of existing plans." *O'Brien County Rural Elec. Coop. v. State Commerce Comm'n*, 352 N.W.2d 264, 268 (Iowa 1984) (quoting *Nishnabotna Valley Rural Elec. Coop. v. Iowa Power & Light Co.*, 161 N.W.2d 348, 352 (Iowa 1968)). In effect, this test permits the utility which serves a majority of a customer's load to serve the entire load, regardless of the territorial boundaries of a service area.

The point of use test requires that only the utility authorized to serve within a certificated territory may provide power to a facility within that territory. Thus, this test strictly enforces the territorial boundaries of regulated utilities in the provision of their electric service. *See Lee County Elec. Coop. v. Marks*, 501 So.2d 585 (Fla. 1987); *Capital Elec. Power Ass'n v. Mississippi Power & Light Co.*, 218 So.2d 707 (Miss.1968); *Holston River Elec. Co. v. Hydro Elec. Corp.*, 17 Tenn.App. 122, 66 S.W.2d 217 (1933); *Re Arizona Edison Co.*, 61 PUR 5 (1945).

The PUC considered the applicability of these tests to the circumstances of this case. The commission made the following findings:

17. The commission finds that the point-of-service test should not be adopted here, because it would allow large customers to bolt from one utility's system by extending their own line to another utility's service territory. Low use customers (i.e. residential and small commercial) who could not afford privately to extend transmission lines to another utility's service area would be left with the responsibility for the fixed costs previously spread to the larger customer base. The use of this test would also allow large firms to abandon high-cost utilities to get lower costs and would thus leave unused plant, further driving up costs to remaining customers. This test could also lead to subterfuge as to land purchase, lease, or right of way

acquisition by large consumers to cross certificated boundaries.

18. The geographic-load-center test cannot be adopted in this proceeding because it is prohibited by Colorado law which allows only the authorized utility to serve in its certificated area. The geographic-load-center test as applied in the circumstances of this matter would allow Public Service to extend service from its certificated territory into Union's exclusive service territory and allow Public Service to serve an independent, preexisting Union load. Union is the sole utility authorized to serve in its territory and Public Service's action in providing service into Union's territory cannot be approved by the Commission.

19. The Commission finds that it is required by Colorado law to use the point-of-use test which allows only the certificated utility to provide service in its territory. It is also found that Public Service, through the distribution line of Morning Fresh, is providing service into Union's certificated territory. This activity of Public Service is being accomplished in contravention of the Colorado doctrine of regulated monopoly, and the agreement incorporated into Decision No. 63322 (Exhibit 12) which prohibits Public Service from rendering any electric service in Union's territory pertinent to this proceeding. The Commission also finds that it is required by the doctrine of regulated monopoly, to preserve the territorial integrity of each utilities [sic] load, so they will know the extent of their load, and to protect each utility's certificated area.

The PUC clearly made a policy decision concerning the point of service test. The commission found that to focus on the point at which electricity is delivered would invite inefficiency, subterfuge, and manipulation of the service area scheme in a manner injurious to the public good. The PUC was not required to find that adoption of the point of service test would result in actual duplication and subterfuge in this particular case. It only needed to find that adoption of the test would create a substantial opportunity for such results to oc-

cur in the future. *See Mobile Pre–Mix Transit, Inc. v. Public Utils. Comm'n,* 618 P.2d 663 (Colo.1980). This type of determination falls squarely within the expertise of the PUC.

The PUC is invested with broad authority to regulate public utilities in this state. Colo. Const. art. XXV; § 40–4–101, 17 C.R. S. (1984); *City of Montrose v. Public Utils. Comm'n,* 629 P.2d 619 (Colo.1981). It has considerable discretion in its choice of the means to accomplish its functions. The PUC has decided that it should not focus on the point at which electricity is delivered in order to determine whether one utility is invading the exclusive territory of another utility. We believe that such a determination is an administrative matter where there is broad latitude for sound discretion. *See Public Serv. Co. v. Public Utils. Comm'n,* 644 P.2d 933 (Colo.1982). Many jurisdictions have arrived at this same conclusion. *See O'Brien County Rural Elec. Coop. v. State Commerce Comm'n,* 352 N.W.2d 264 (Iowa 1984); *Holston River Elec. Co. v. Hydro Elec. Corp.,* 17 Tenn. App. 122, 66 S.W.2d 217 (1933); *Re Lukens Steel Co.,* 57 PUR 4th 524 (1984); *Re Arizona Edison Co.,* 61 PUR 5 (1945). Because this is a matter within the sound discretion of the PUC, we believe the trial court erred in substituting its judgment for that of the PUC. *See Atchinson, Topeka & Santa Fe Ry. v. Public Utils. Comm'n,* 194 Colo. 263, 572 P.2d 138 (1977).

Having made the policy decision that the legality of electrical service by a particular utility should not be determined by the point at which electricity is delivered, the PUC examined the two remaining tests. Each of these tests focuses on the point at which electricity is consumed in order to test the legality of a utility's actions. The PUC determined that, under the circumstances of this case, the doctrine of regulated monopoly prohibited the use of the geographic load center test, and thus, required that the point of use test be applied. We believe the district court erred in reversing this determination by the PUC.

It is undisputed that the majority of Morning Fresh's electrical requirements

are located within Public Service's certificated area. Thus the geographic load center test would require that Public Service be permitted to serve those loads situated in Union's territory, without regard to the exclusive nature of the service areas.

The facilities located in Union's territory are not physically connected to those facilities situated in Public Service's territory.[2] In fact, the brooder houses and feed mill are located almost one-half mile from Morning Fresh's other facilities. The PUC decided that to allow Public Service to extend service from its certificated territory into Union's exclusive territory, so as to serve two completely separate and independent loads which had previously been served by Union, would be inconsistent with the doctrine of regulated monopoly. Under the circumstances of this case, we agree.

Colorado has long been dedicated to the principle of "regulated monopoly" in the conduct of public utilities operations. *Western Colorado Power Co. v. Public Utils. Comm'n,* 159 Colo. 262, 411 P.2d 785 (1966). The doctrine has its basis in section 40-5-101, 17 C.R.S. (1984), which states in pertinent part:

(1) No public utility shall begin ... any extension of its facility, plant, or system without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction ... If any public utility, in constructing or extending its line, plant, or system interferes or is about to interfere with the operation of the line, plant, or system of any other public utility already constructed, the commission, on complaint of the public utility claiming to be injuriously affected, after hearing, may make such order prohibiting such construction or extensions ... as to it may seem just and reasonable.

(2) Whenever the commission ... finds that there is or will be a duplication of service by public utilities in any area, the commission shall, in its discretion, issue a certificate of public convenience and necessity assigning specific territories to one or to each of said utilities or by certificate of public convenience and necessity to otherwise define the conditions of rendering service and constructing extensions within said territories....

This statute was designed to prevent duplication of facilities and competition between utilities, and to authorize new utilities in a field only when existing ones are found to be inadequate. *Western Colorado Power Co.,* 159 Colo. at 273, 411 P.2d at 791.

■ After a utility has been assigned a specific territory, no other utility may provide service in that territory unless it is established that the certificated utility is unable or unwilling to provide adequate service. *See City of Greeley v. Poudre Valley Rural Elec. Ass'n,* 744 P.2d 739 (Colo.1987); *Public Serv. Co. v. Public Utils. Comm'n,* 142 Colo. 135, 350 P.2d 543 (1960). "[O]nce an area has been certificated to one utility, it and it alone has the right to serve the future needs of that area provided it can do so. This is essential to the doctrine of regulated monopoly in Colorado." *Public Utils. Comm'n v. Home Light & Power Co.,* 163 Colo. 72, 428 P.2d 928 (1967).

This exclusive right to serve an area is a property right which cannot be affected except by due process of law. *Public Serv. Co. v. Public Utils. Comm'n,* 174 Colo. 231, 483 P.2d 1337 (1971); *Western Power & Gas Co. v. Southeast Colorado Power Ass'n,* 164 Colo. 344, 435 P.2d 219 (1967).

■ Neither Public Service nor Morning Fresh made any showing that Union was unwilling or incapable of providing adequate service to the Morning Fresh facilities within its territory. In fact, the record establishes that Union adequately served those facilities for years. Without such a showing, the PUC was prohibited from approving Public Service's extension into Union's certificated territory. *Public Serv. Co. v. Public Utils. Comm'n,* 174 Colo.

**2.** In this discussion, we do not consider the laying houses which straddle the territorial boundary because Union has not contested Public Service's actions in providing electricity to them.

470, 485 P.2d 123 (1971); *Public Serv. Co. v. Public Utils. Comm'n*, 174 Colo. 231, 483 P.2d 1337 (1971).

In addition, because the area was already certificated to Union, the decision as to which utility should serve the brooder houses and feed mill could not be based on a finding that one or the other could better serve the facilities. *See Public Serv. Co. v. Public Utils. Comm'n*, 174 Colo. 470, 485 P.2d 123 (1971); *Public Utils. Comm'n v. Poudre Valley Rural Elec. Ass'n*, 173 Colo. 364, 480 P.2d 106 (1970).

■ Finally, both utilities could not be permitted to serve in the same area, because nonexclusive areas are inconsistent with the doctrine of regulated monopoly. *Western Colorado Power Co. v. Public Utils. Comm'n*, 163 Colo. 61, 428 P.2d 922 (1967). We therefore agree that use of the geographic load center test, under the facts of this case, would be inconsistent with the doctrine of regulated monopoly.

■ In contrast, if the point of use test is applied, the territorial boundaries of the certificated areas are respected. The point of use test requires, in essence, that if electricity is to be used in the certificated territory of one utility, that utility must be afforded the right to serve. Neither the customer, nor another utility, may circumvent the service boundaries by shifting the delivery point. *Lee County Elec. Coop. v. Marks*, 501 So.2d 585 (Fla.1987); *Capital Elec. Power Ass'n v. Mississippi Power & Light Co.*, 218 So.2d 707 (Miss.1968); *Holston River Elec. Co. v. Hydro Elec. Corp.*, 17 Tenn.App. 122, 66 S.W.2d 217 (1933); *Re Arizona Edison Co.*, 61 PUR 5 (1945).

We therefore agree that, once the PUC has determined that the point at which electricity is delivered is not determinative, the focus shifts to the point at which electricity is consumed. As a general rule, the PUC may elect to apply either the point of use test or the geographic load center test in order to determine which utility should serve a particular facility. However, where, as here, the electricity is used at a facility located solely within a utility's exclusive area; the facility is not physically interconnected with a facility outside the exclusive territory; and the facility was previously served by the utility in whose area it is located; the doctrine of regulated monopoly requires that the point of use test be applied to protect the rights of the certificated utility against encroachment.

■ We wish to emphasize what we have not held. We have not held that the point of use test is required by the doctrine of regulated monopoly in every case. The PUC may, in the future, conclude that the point at which electricity is delivered should be the focal point in determining the legality of a utility's actions. We have also not held that the geographic load center test may never be used. We express no opinion as to the appropriate test where a single facility straddles two service areas, where separate yet interconnected facilities are situated within two service areas, or where a previously unserved facility requires electrical service. The PUC, in its discretion, may decide that the geographic load center test would be appropriate in these situations.[3] We simply hold that, under the circumstances of this case, the PUC did not err in its decision to use the point of use test.[4]

**3.** For example, the PUC might decide that a different test should be used to determine which utility should serve the egg laying houses which straddle the Public Service–Union boundary.

**4.** Morning Fresh and Public Service argue that use of the geographic load center test is not inconsistent with the doctrine of regulated monopoly under the circumstances of this case. In support of this contention they note that, although Iowa maintains a system of exclusive service areas, use of the geographic load center test was approved in *O'Brien County Rural Electric Coop. v. State Commerce Comm'n*, 352 N.W.

2d 264 (Iowa 1984). However, the Iowa public utilities commission operates under the following grant of authority:

In order to effect that public interest, the commission may establish service areas within which specified electric utilities shall provide electric service to customers on an exclusive basis.... However, those boundaries may be modified by the commission to promote the public interest, to preserve existing service areas and electric utilities' rights to serve existing customers, and to prevent unnecessary duplication of facilities, to take account of natural and physical barriers which

## B.

■ The district court found that the PUC's decision to apply the point of use test was fatally inconsistent with its acquiescence to Public Service's provision of electricity to those egg laying houses located within Union's service territory. We believe the trial court erred in considering the provision of electrical service to the laying houses. Because the laying houses were integrally related additions to a pre-existing facility located within Public Service's certificated area, Union did not dispute the extension of service across the territorial boundary line. In fact, when evidence concerning the laying houses was presented, Union objected to its relevancy and the matter was dropped from consideration. The record contains no evidence concerning the laying houses and the PUC made no findings as to the legality of service. Therefore, the trial court erroneously extended its review to encompass the propriety of electrical service to the laying houses. Absent such consideration, the record discloses no fatal inconsistency which would require the PUC order to be set aside.[5]

## III.

■ Even if the trial court had been correct in holding that the doctrine of regulated monopoly did not compel the point of use test, the PUC's decision rested on a separate and adequate ground which should have been upheld. In 1964, Public Service and Union attempted to resolve their ongoing territorial disputes by means of an agreement between the parties. This agreement was incorporated into PUC Decision No. 63322, which certificated certain exclusive service areas to each of the utilities. The PUC found that Public Service's actions here violated this agreement.

Because Decision No. 63322 incorporated the 1964 agreement without modification, we turn to the standard principles of contract construction in order to determine whether the contract has been violated. *Union Rural Elec. Ass'n v. Public Utils. Comm'n,* 661 P.2d 247 (Colo.1983). Public Service and Union agreed that Union would render exclusive electric service in several areas, including Area B, in which the Morning Fresh brooder houses and feed mill are located. The agreement provides that Union would have the exclusive right to serve all electric requirements in Area B and that Public Service would serve no customers in that area. We think it is significant that both provisions are used in delineating the exclusive territories. Although Public Service may argue that its customer, Morning Fresh, is located within its own territory, it is clear that the electrical requirements of the feed mill and the brooder houses are located within Union's exclusive territory.

In addition, the contract states "Public Service shall not extend its facilities *or* render any electric service within areas A, B and C...." (Emphasis added.) We must adopt a construction of the agreement that will give effect to all of its provisions. *Union Rural Elec. Ass'n,* 661 P.2d 247. The use of the disjunctive "or" in the last quoted clause can only mean that the parties and the PUC intended to foreclose not only service by means of extension of facilities, but also any form of indirect service whereby Public Service might "render any electrical service within areas A, B and C" without physical exten-

---

would make electrical service beyond these barriers uneconomic and impractical.... *O'Brien,* 352 N.W.2d at 269 (citing Iowa Code § 476.25). Because our public utility statutes contain no such exception, the Iowa decision is distinguishable and does not compel a finding that the geographic load center test is consistent with the doctrine of regulated monopoly as applied in Colorado.

5. Even if the extension of electrical service over the territorial boundary to the laying houses were properly under consideration in this case, we cannot say that PUC acquiescence in such

service would be inconsistent with the point of use test. Union itself conceded that the point of use test is not applicable where an individual facility is astride or grows across the boundary line of two contiguous utilities. Unlike the feed mill and the brooder houses, the laying houses were necessarily accessory to the main facility located in Public Service's exclusive territory. Under these circumstances, a different rule might be appropriate. *See VMJ Company v. City of Lorain,* 105 Ohio App. 166, 151 N.E.2d 667 (1957), and the discussion above.

sions. Any other construction would make the second part of the clause redundant. We therefore believe that the PUC was correct in concluding that Public Service's actions violated the agreement.

## IV.

 Public Service and Morning Fresh argue that, where a customer's property is located within two exclusive service territories, the customer should be permitted to choose the utility from which it will receive electricity. While we sympathize with the difficult position in which Morning Fresh has found itself, the policy behind the doctrine of regulated monopoly does not permit a customer to pick and choose between utilities. The doctrine of regulated monopoly is designed to protect the interests of the public as a whole, by preventing competition and inefficient duplication of services. *Public Serv. Co. v. Public Utils. Comm'n,* 142 Colo. 135, 350 P.2d 543 (1960). The doctrine was not designed to protect the needs of the individual consumer. We have already stated that "allowing customers to pick and choose from whom they will obtain any public utility service obviously creates rather than prevents duplication, fosters rather than controls competition, and totally disregards the principle that inadequacy of existing facilities must be shown in order to authorize a new service." *Western Colorado Power Co. v. Public Utils. Comm'n,* 159 Colo. 262, 274, 411 P.2d 785, 791 (1966). As was stated in *Lee County Electric Coop. v. Marks,* 501 So.2d 585, 587 (Fla.1987), " 'an individual has no organic, economic or political right to service by a particular utility merely because he deems it advantageous to himself.' Larger policies are at stake than one customer's self-interest, and those policies must be enforced and safeguarded by the [Public Utilities Commission]." (quoting *Storey v. Mayo,* 217 So.2d 304, 307–08 (Fla. 1968), *cert. denied,* 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969)). *See also Capital Elec. Power Ass'n v. Mississippi Power & Light Co.,* 218 So.2d 707 (Miss. 1968).

## V.

 The district court found that, because Morning Fresh would have to rework its distribution system, the PUC unlawfully exercised subject matter jurisdiction over a non-utility. We disagree. In this case, the PUC has not ordered Morning Fresh to take any action. The commission's order was directed solely at Public Service. Although Morning Fresh will be affected by this order, any PUC order to a utility has some ultimate effect on the utility's customers. Such a fact cannot be equated with an exercise of unlawful jurisdiction over a non-utility.

We reiterate that the PUC has not required Morning Fresh to take any affirmative action concerning its property. We note that after the distribution system was constructed, Union continued to supply power to the feed mill and the brooder houses until it was requested to disconnect power on May 31, 1984. It therefore appears that Union could reconnect service to Morning Fresh without any disturbance to Morning Fresh's distribution system.

## VI.

 The district court found that the PUC order deprived Morning Fresh of its constitutional right to the protections of due process of law in acquiring, using, and disposing of its property. We disagree. We do not believe that Morning Fresh was denied due process since it was given the right both below and in this court to file briefs and to be heard, which it utilized fully. *See Capital Elec. Power Ass'n v. Mississippi Power & Light Co.,* 218 So.2d 707 (1968).

In finding a due process deprivation, the district court relied on the fact that Morning Fresh had no notice of the PUC's policy concerning a private electric distribution system which would transmit electricity across territorial boundaries at the time its system was installed. We do not find this fact to be controlling. The record reflects that Morning Fresh was aware that its actions would not be acceptable to Union well before the distribution system was completed. Morning Fresh was aware of

potential disapproval even before the distribution system contract was signed and was definitely made aware of a potential legal dispute several days after construction of the system was commenced. Morning Fresh was aware that construction of its system was attended with risk, and it engaged in such activity with full knowledge of the possible consequences. We faced a similar question in *Western Colorado Power Co. v. Public Utilities Comm'n,* 159 Colo. 262, 285, 411 P.2d 785, 797 (1966), where we stated:

> The court is aware that the Hayden Plant is now constructed. This fact, however, cannot subvert the legal principles upon which our decision is based nor be allowed to defeat the doctrine of regulated monopoly to which Colorado subscribes. It is clear that [the parties] recognized that construction of the Hayden Plant during litigation was attended with substantial risk, and they engaged in such activity with full knowledge of the possible consequences.

> For good reason, no contention is made that the construction precludes decisions by this court. It is the law that when the interest of the public is concerned it is not only the right but the duty of an appellate court to determine the issues, regardless of interim construction.

We believe the same principles apply to the case at bar.

■ The touchstone of due process is whether the decision comports with fundamental fairness. Based on the record here, we do not believe that the PUC order results in an abridgement of Morning Fresh's due process rights.

Accordingly, the order of the district court is reversed and the case is remanded with directions to reinstate the decision of the PUC.