Crosby L. POWELL, Crosby L. Powell & Associates, Michael Townes, Betty Lou Townes, Donzell Rosenberg, and all other inmates similarly situated in the Colorado Department of Corrections, Petitioners–Appellants,

v.

COLORADO PUBLIC UTILITIES COMMISSION; Robert J. Hix, Vincent Majkowski, R. Brent Alderfer, Commissioners Thereof; Colorado Inmates' Phone System; Colorado Department Of Corrections; And Sprint Communications Company, L.P., Respondents–Appellees.

No. 97SA75.

Supreme Court of Colorado,
En Banc.

April 27, 1998.

Rehearing Denied May 18, 1998.

E. Ronald Beeks, Evergreen, CO, for Petitioners–Appellants.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Linda L. Siderius, Deputy Attorney General, Raymond L. Gifford, First Assistant Attorney General, Gregory Sopkin, Assistant Attorney General, Regulatory Law Section, Denver, CO, for Respondents–Appellees Colorado Public Utilities Commission, Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer, Commissioners thereof

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, John August Lizza, First Assistant Attorney General, Diane Michaud, Assistant Attorney General, State Services Section, Denver, Colorado, for Respondents–Appellees Colorado Department of Corrections.

McGloin, Davenport, Severson and Snow, Professional Corporation, Michael M. McGloin, Denver, CO, for Respondents–Appellees Sprint Communications Company L.P.

Justice KOURLIS, delivered the Opinion of the Court.

Crosby Powell, Donzell Rosenberg, Michael Townes, Betty Lou Townes and other inmates in the Colorado Department of Corrections (collectively referred to as Powell) appeal from a judgment of the district court affirming orders of the Colorado Public Utilities Commission (PUC). This court has direct appellate jurisdiction under section 40–6–115(5), 11 C.R.S. (1997). Powell essentially argues that the inmate telephone system provided by Sprint Communications Company L.P. (Sprint) and implemented by the Department of Corrections (DOC) violates public utilities law by overcharging for inmate calls. The PUC concluded that it had no

jurisdiction over the inmates' complaints, because the DOC was not a public utility or a provider of nonoptional operator services as a reseller of toll service, and because the equipment provided by Sprint was not regulable. Powell also claimed that Sprint had no certificate of convenience and necessity, with accompanying tariffs, to provide inmate phone service, and thus was operating in violation of the public utilities law. The PUC held that no separate certificate and tariff were required, and that Sprint was properly operating under its basic long distance tariff. The district court affirmed the PUC, and we agree that the PUC did not have jurisdiction over Sprint or the DOC to review the fairness of procedures and charges for inmate telephone usage at DOC. We also agree that Sprint was not required to file a separate certificate and tariff for inmate phone service.

## I. Facts and Procedural History

This case concerns objections to the cost of personal telephone calls initiated by inmates while incarcerated. The phone system in question, and the associated DOC regulations for its use, were in place from 1991 to early 1995. Under an earlier agreement between DOC and Sprint, inmates were allowed to make long distance calls by placing collect calls from pay phones on DOC property using the services of an operator to complete the calls. That system was vulnerable to massive abuse by the inmates, with fraud from the account estimated at approximately $170,000 per month in uncollectible billings. Sprint and DOC both concluded that the system had to be reworked in order to assure that the possibility of abuse was minimized or eliminated.

Sprint and the DOC worked together to create specifications for a new computerized phone system that would allow inmates to prepay money into a personal account and use these funds to make calls to preapproved numbers.[1] A similar system, consisting of PBXs[2] and custom software, had already

---

1. In addition to preventing fraud, the DOC sought to address the problem of inmates placing harassing and threatening calls to victims and their families.

2. PBX stands for "Private Branch Exchange," a system that, among other things, allows a customer to communicate both within its company and also with outside parties.

been developed by BellSouth Communications and Hitachi for the Federal Bureau of Prisons and was in use at the Butner Federal Corrections Facility in Butner, North Carolina. Sprint and the DOC agreed upon a series of modifications to the BellSouth/Hitachi system for use by the DOC, and Sprint commissioned Hitachi to develop the system.

Hitachi created the "Safeblock" system to meet Sprint's and the DOC's specifications. Safeblock consisted of two primary components—PBXs and an applications processor. Each DOC facility had a central PBX with an applications processor and tamper-proof phones located throughout the facility. US West owned the phone instruments and the switches[3] for local calls. Sprint owned the PBXs and the switches for long distance calls.

In order to place a call using the Safeblock system, an inmate first dialed a nine-digit personal ID number. Next, the inmate dialed a two-digit speed dial number that corresponded to a preapproved telephone number. The system verified that the inmate's PBX account had sufficient funds to cover up to a fifteen-minute telephone call to that number.[4] The call was then routed through the local exchange carrier (US West) and on to Sprint's interface.

The Safeblock system was implemented in 1991 when Sprint and the DOC executed an amendment to their earlier contract. The amendment provided in pertinent part that Sprint would install and implement the Safeblock system at Sprint's expense, and that the DOC would administer Safeblock at the DOC's expense. DOC employees were responsible for, among other things, data entry, inputting speed-dialing numbers, handling inmate grievances, distributing paperwork and providing account balances. The

DOC received from Sprint a 19% commission on all billed revenues. Upon receipt of this commission, the DOC deposited the money directly into the "Canteen and Library Fund." By statute and by DOC regulation, profits from this fund (amounts in excess of the cost of administration of the canteens) are used solely for "educational and recreational supplies and equipment and to supplement direct inmate needs." § 17–20–127(2), 6 C.R.S. (1997)(creating the Canteen and Library Fund in the state treasury); *see also* Colo. Dep't of Corrections Administrative Regulation No. 200–7 (effective June 10, 1985)(providing that proceeds from the Canteen and Library Fund "may be expended only for the educational, recreational, and social benefit of the inmates").[5] Accordingly, expenses incurred in administration of the phone system were paid out of the fund and any excess was used directly for programs benefiting inmates.

The amendment also provided that Sprint would charge the DOC a system assessment fee of $1.25 per call plus an amount equal to Sprint's tariffed rate for long distance service. The system assessment fee was the method by which DOC compensated Sprint (which had paid Hitachi) for the custom development and delivery of the Safeblock system. DOC passed this cost along to the users of the system, the inmates, such that they were paying $1.25 per call plus the tariffed long distance rate.

It is the $1.25 per call system assessment fee which is at the heart of the inmates' dissatisfaction with the phone system, but they make several other complaints as well. They object to charges for calls unintentionally completed to answering machines. Those charges occur because the inmates do

---

**3.** Switches route calls to the appropriate destination and are generally part of the public telephone network, belonging to either a local or long distance carrier. Generally, switches are located in a central location within a carrier's area of service, and all of its customers in a defined area are connected to one switch.

**4.** In order to accommodate the prepayment feature, calls were limited to fifteen minutes, but inmates could hang up and redial if they had sufficient funds in their account.

**5.** Powell submitted a copy of the minutes from a wardens' meeting in which some wardens indicated that they wanted more input into the process by which the General Assembly redistributed these funds for inmate use. No evidence submitted by Powell or found anywhere in the record indicates that the funds were not properly allocated to the Canteen and Library Fund or that the Canteen and Library Fund was not properly allocated to inmate programs.

not have the option of initiating person-to-person or collect calls due to the prior abuse of that privilege. The inmates also claim that they are charged for uncompleted calls if the phone rings too many times, and for completed calls from the time the phone begins to ring, rather than from when the line is answered.

Thus in September of 1993, the inmates, unhappy with the system assessment fee, the answering machine charges, and the alleged ring time and unanswered call charges, filed a complaint with the PUC. In addition to their allegations concerning billing practices, the inmates claimed that Sprint and the DOC were operating in violation of the public utilities law because they had not obtained a certificate of convenience and necessity, and received approval for a tariff, specifically covering inmate phone service. The inmates thus maintained that they were entitled to a refund of the full amount of DOC billings for long distance since inception of the Safeblock system.

After a considerable amount of discovery, the Administrative Law Judge (ALJ) granted motions for summary judgment in favor of DOC and Sprint, concluding that the PUC had no jurisdiction to entertain the inmates' complaints. *See* Dec. R96–51 (Jan. 16, 1996). He found that DOC was neither a telephone corporation nor a provider of telecommunications service. As to Sprint, the ALJ found that Sprint had basically provided two items: toll service (known as interLATA toll service)[6] and customer premises equipment (CPE). The ALJ determined that the Safeblock system was merely a sophisticated PBX, properly classified as CPE, and as such had long been exempt from state regulation. Additionally, he noted that the fact that the CPE was paid for on a per-call basis (the $1.25 charge) rather than by a flat fee or some other method, did not change the basic nature of the Safeblock system as CPE. With respect to the actual tariffed toll service, he found that Powell had not challenged the tariffed rates for this service or compliance with the rates.

Powell filed exceptions to Decision R96–51. He argued that the $1.25 fee was not an equipment fee but a service charge, and as such, made DOC a reseller of telecommunications services. The telecommunications service being resold, according to Powell, was a nonoptional operator service, regulated under section 40–15–301(2)(g) and 4 C.C.R. § 723–18, Rule 3.3 (adopted 1992 and as amended).

In Powell's exceptions related to Sprint, he opposed summary judgment on two bases. First, he argued that he had, in fact, challenged Sprint's tariffed rates by alleging that Sprint had not filed a certificate of necessity and convenience for "inmate telephone service" and had never filed tariffs for such service. Second, he insisted that Sprint, through Safeblock, was providing a nonoptional operator service.

The PUC denied the exceptions in Decision No. C96–457. Powell filed an application for rehearing, reargument or reconsideration, and by Decision No. C96–589, the PUC denied his application. The PUC made no findings of fact or resolution of the underlying issues concerning the fairness of the procedures and charges to the inmates because it determined that it had no jurisdiction to do so.

Powell then filed an action in the Denver District Court. The district court affirmed the PUC's orders as just, reasonable and in accordance with the evidence. Powell appealed the district court's ruling directly to this court under authority of section 40–6–115(5), 11 C.R.S. (1997). He raises three issues: (1) whether the PUC has jurisdiction over Sprint and the DOC to consider the propriety of the $1.25 fee, the answering machine charges and the alleged charges for ring time and unanswered calls; (2) whether the DOC's supplying of space and bill-collecting, in return for a 19% commission, made the DOC a reseller of inmate toll service; and (3) whether Sprint was required to file a separate certificate of convenience and necessity and obtain approval for a tariff specifically covering inmate phone service.

---

6. LATA is an acronym for "Local Access and Transport Area," and describes the areas which, at the time, corresponded to the state's two area code boundaries.

## II. Standard of Review

■ We begin with an examination of well-settled principles governing our review of PUC decisions. Judicial review of a PUC order is limited to determining whether the PUC has regularly pursued its authority, whether the decision is just and reasonable, and whether the conclusions reached are in accordance with the evidence. *See* § 40–6–115(3), 11 C.R.S. (1997); *Silverado Communication Corp. v. Public Utils. Comm'n,* 893 P.2d 1316, 1319 (Colo.1995). Courts are required to decide questions of law. *See Union Rural Elec. Ass'n v. Public Utils. Comm'n,* 661 P.2d 247, 251 (Colo.1983). However, the PUC is the agency charged with administration of the public utilities laws, and thus courts should defer to the PUC's interpretation of the statute, as well as PUC regulations. *See Lucero v. Climax Molybdenum Co.,* 732 P.2d 642, 645–46 (Colo. 1987); *Public Utils. Comm'n v. Grand Valley Rural Power Lines, Inc.,* 167 Colo. 257, 261, 447 P.2d 27, 28 (1968).

■ The PUC's findings of fact may not be set aside if they are supported by substantial evidence in the record. *See Ace West Trucking, Inc. v. Public Utils. Comm'n,* 788 P.2d 755, 762 (Colo.1990). Substantial evidence means a sufficient amount of evidence to support a conclusion, or to survive a directed verdict if the facts were tried to a jury. *See id.* In determining whether substantial evidence to support a finding of fact exists, courts must view the record in a light most favorable to the PUC. *See Integrated Network Servs. v. Public Utils. Comm'n,* 875 P.2d 1373, 1378 (Colo. 1994). Furthermore, the PUC holds considerable technical expertise over utility regulation, and courts should accord deference to its decisions. *See id.* at 1377.

## III. PUC Jurisdiction

The PUC held that it did not have jurisdiction to review or regulate Sprint or the DOC with respect to the Safeblock inmate telephone system. We agree. PUC jurisdiction over telephone service can arise in two ways. If an entity is a public utility, the PUC has general jurisdiction to ensure that charges for its services and commodities are just and reasonable. *See* § 40–3–101(1), 11 C.R.S. (1997). If an entity is not a public utility, it may nonetheless be subject to PUC jurisdiction if it provides a telecommunications service that was not deregulated by the General Assembly in 1987. *See* § 40–15–101, 11 C.R.S. (1997). As discussed below, the DOC is not a public utility and the Safeblock system is a deregulated service. Sprint is a public utility which here provides both regulated (interLATA service) and deregulated (PBX and software) services. Sprint's regulated service is not at issue in this case. Hence, the PUC has no jurisdiction here over the DOC, and its jurisdiction over Sprint is not implicated.

### A. Jurisdiction Over the DOC

We begin by noting that the Safeblock system was provided as a privilege to inmates for the purpose of making personal telephone calls. Powell does not argue, and this court has never held, that inmates have a constitutional right to use the phone for personal and social purposes. Although prisoners do have a right of access to the courts, which can include telephonic access upon occasion, such access is not at issue in this case. *See, e.g., Ramos v. Lamm,* 639 F.2d 559, 582–85 (10th Cir.1980)(holding that prisoners have a constitutional right to meaningful access to courts and examining the facility as a whole to determine whether such access was sufficient). The record in this case indicates that a separate policy existed to allow inmates access to the courts and to their attorneys through the DOC's regular phone system, with no charges assessed to indigent inmates.[7]

■ The authority to "manage, supervise, and control" penal institutions is vested in the executive director of the DOC, not in the courts or the PUC. § 17–1–103(1)(a), 6 C.R.S. (1997). Prison administrators neces-

---

7. Inmates could also include their attorneys on the preapproved telephone number list for the Safeblock system. Because the Safeblock system was subject to monitoring by the DOC, inmates were allowed, upon special request, to place unmonitored attorney calls through the DOC's regular phone system.

sarily require significant flexibility in executing policies and procedures for the safe and orderly management of prisons. *See Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Thus, absent a statutory or constitutional violation, courts generally do not intervene in matters of prison administration and defer to the DOC in the management of penal institutions. *See, e.g., Tuggle v. Evans*, 457 F.Supp. 1015, 1017 (D.Colo.1978); *Montoya v. Tanksley*, 446 F.Supp. 226, 228 (D.Colo.1978).

■ The inmates contend that the DOC is not simply managing the institution, but is actually acting as a public utility. The inmates claim that the DOC is either a "telephone corporation" under section 40–1–103(1)(a), 11 C.R.S. (1997), or a provider of "telecommunications service" under section 40–15–102(29), 11 C.R.S. (1997). The ALJ, in his findings of fact, determined that DOC did not own any of the hardware or software comprising the Safeblock system, and did not rent any telephone lines for inmates' use. *See* Dec. No. R96–51 (Jan. 16, 1996). DOC activity connected to Safeblock was limited to "providing a location for the telephone instruments; collecting money from the inmates for the phone calls and performing related accounting functions; approving the phone numbers to be called; and paying Sprint for the [long distance] calls." *Id.* The ALJ found that, as a matter of law, these activities did not make DOC a "telephone corporation" or constitute a "telecommunications service." *Id.*

■ Section 40–1–103(1)(a) defines a public utility as a "telephone corporation . . . operating for the purpose of supplying the public." § 40–1–103(1)(a), 11 C.R.S. (1997). Analysis of whether an entity is a "public utility" has traditionally centered around whether or not the public has a right to demand the service. *See Public Utils. Comm'n v. Interstate Gas Co.*, 142 Colo. 361, 377–78, 351 P.2d 241, 248–49 (1960). Here, as we have previously noted, the inmates, and members of the public with whom they communicate by phone, do not have the right to demand use of the phones for personal or family purposes. More importantly, however, in this case the salient analysis has more

to do with the nature of the service provided rather than the public's right to demand it. We believe that the PUC reached a correct conclusion that providing accounting functions and space for a phone system does not make DOC a "telephone corporation" under section 40–1–103(1)(a).

■ "Telecommunications service" is defined as "the electronic or optical transmission of information between separate points by prearranged means." § 40–15–102(29), 11 C.R.S. (1997). Again, all the evidence in the record concerning DOC's participation in providing Safeblock supports the PUC's holding that DOC does not optically transmit information, but simply provides accounting functions and space for equipment. We thus conclude that the PUC also made a correct determination that the DOC was not providing a "telecommunications service."

■ Finally, the inmates assert that DOC is regulable as a provider of nonoptional operator service through resale of toll service to the inmates under 4 C.C.R. 723–18 rule 3.3. This rule provides in pertinent part:

> Nonoptional operator services provided by or through hotels, motels, or other lodging-type entities which resell intrastate toll and wide area telephone services (WATS) to their lodging patrons [and] nonoptional operator services provided by or through any other entities which resell to the general public long distance telephone services by using the tariff services and facilities of regulated telephone utilities . . . are regulated by the Commission.

4 C.C.R. 723–18 rule 3.3.

> The statute defines nonoptional operator services as:

> Operator services requiring an operator for individualized call processing or specialized billing including, without limitation, credit card calls, calls billed to third numbers, collect calls, and person-to-person calls, or operator services to provide telephone services to inmates at penal institutions.

§ 40–15–102(19.5), 11 C.R.S (1997). PUC regulations more specifically spell out the

types of services regulated as nonoptional operator services and include within the definition:

*Calls made by inmates at penal institutions or other correctional facilities who are not permitted to use coins when placing calls at coin operated or coinless telephones* or who are required to use an operator's services to complete a call because of the rules or regulations of said institutions or facilities.

4 C.C.R. 723–18 Rule 3.1.3 (emphasis added).

The inmates claim that Safeblock falls within the italicized portion of this definition, and ask us to interpret the definition of *nonoptional* operator services in isolation from the broader definition of operator services. Operator services are defined as

services provided either by live operators or by the use of recordings or computer voice interaction to enable customers to receive individualized and select telephone call processing.... "Operator services" includes nonoptional operator services....

§ 40–15–102(20), 11 C.R.S. (1997). It is undisputed that the Safeblock system did not utilize operators, live or recorded, in its operation.[8] The PUC found that nonoptional operator services were a "subset of the greater universe of operator services" and thus Safeblock could not be considered a nonoptional operator service because it did not involve operators in any manner. We find it logical and reasonable to conclude that one cannot provide nonoptional operator service unless operator service is being provided. Hence, we defer to the PUC's interpretation of its own rules and its interpretation of the public utilities law that it is charged with administering.

■■■ It is also important to consider that the concerns behind regulation of nonoptional operator services are not directly implicated

in this situation. Generally, operator assisted calls cost more than direct dial calls. Thus, it makes sense to regulate the cost of this service where it is nonoptional to a customer. Here, the inmates are charged the same tariffed rates that apply to direct dial customers.[9]

Accordingly, we find that the DOC is not regulable as a reseller of toll services because that definition requires the provision of nonoptional operator services, and the DOC does not provide an operator service of any kind.

## B. Jurisdiction over Sprint

Sprint is undoubtedly a telephone corporation, and thus a public utility, as defined in section 40–1–103(1)(a). Not all services offered by public utilities, however, are regulated. *See* §§ 40–15–401 to –404, 11 C.R.S. (1997). Public utilities can and do offer a mix of both regulated and deregulated services. Here the PUC found that Sprint's contract with the state called for the provision of two items: (1) interLATA toll service, and (2) the Safeblock system. Toll service is regulated by tariff, and Sprint was providing this service at the tariffed rates.

The inmates maintain that the Safeblock system was regulated under the provisions of Article 15, Title 40, dealing with intrastate telecommunications services. This article, repealed and reenacted in 1987, was intended to foster competition among telecommunications services providers. *See* § 40–15–101, 11 C.R.S. (1997). Parts Two, Three and Four of Article 15 specify which products and services will remain regulated, which will be subject to partial regulation and which are deregulated. Part Two of Article 15 specifies those telecommunications services which continue to be subject to traditional, monopoly rate-of-return regulation. *See* §§ 40–15–201 to –208, 11 C.R.S. (1997)(list-

---

**8.** We also note that the services at issue here all occur within the CPE (Safeblock) itself, before the proposed call actually exits the correctional facility via the phone lines. Once the CPE has verified that the inmate can call the requested number and has sufficient funds in his or her account, the call proceeds just as a direct dial call through phone lines to US West and then on to Sprint.

**9.** The $1.25 charge is a separate equipment charge necessitated by the inmates' fraudulent use of operator services. This charge for equipment would be unregulable by the PUC regardless of whether or not it had jurisdiction over a nonoptional operator service.

ing, among other things, basic local exchange service, emergency service, public coin telephone service and white page directory as regulated services). Part Four designates certain services as deregulated. *See* §§ 40–15–401 to –404, 11 C.R.S. (1997). Part Three services were termed "emerging competitive telecommunications services" and are subject to alternative forms of regulation such as "flexible pricing, detariffing, and other ... methods of regulation." § 40–15–302(1), 11 C.R.S. (1997). Part Three includes nonoptional operator services, and also provides that any telecommunications service not defined under the statute or classified under Parts Two or Four, shall be classified under Part Three as an emerging service. *See* §§ 40–15–301(g) and –305(2), 11 C.R.S. (1997).

■ As we have previously discussed, the Safeblock system did not utilize operators, and thus could not be classified as a nonoptional operator service. The inmates argue that even if Safeblock were not considered a nonoptional operator service, it is still regulable under the catch-all provision of Part Three. *See* § 40–15–305(2), 11 C.R.S. (1997).

The catch-all provision does not apply in this case because certain telephone services were deregulated at the federal level, and federal law now preempts regulation of telephone equipment such as the Safeblock system. The PUC found that the Safeblock system, which included the PBXs and the software used to run them, consisted of "customer premises equipment" and as such was not subject to state regulation. We agree.

In 1980 and 1981, the Federal Communications Commission (FCC) issued a series of three opinions in connection with its rulemaking authority over regulatory issues implicated by new computer technologies. *See In the Matter of Amendment of Section 64.702 of the Comm'ns Rules and Regulations,* 77 F.C.C.2d 384 (May 2, 1980)[Second Computer Inquiry]; *Second Computer Inquiry Reconsidered,* 84 F.C.C.2d 50 (Dec. 30, 1980); *Second Computer Inquiry Further Reconsidered,* 88 F.C.C.2d 512 (Oct. 30, 1981). The United States Circuit Court of Appeals for the District of Columbia reviewed these opinions in *Computer & Com-*

*munications Industry Association v. Federal Communications Commission,* 693 F.2d 198 (D.C.Cir.1982). These FCC opinions, as well as the federal court's opinion, leave no doubt that CPE was unbundled from traditional charges for transmission, deregulated at the federal level, and by preemption, deregulated at the state level. In *Second Computer Inquiry Further Reconsidered,* the FCC stated:

> In this proceeding we have to date preempted the states in two respects. First, we have determined that the provision of enhanced services ... are [to be] free from public utility-type regulation. [citation omitted] We have also determined that utility regulation of CPE is contrary to the national public interest because of its effect upon communications ratepayers and the competitive development of CPE markets.

*Second Computer Inquiry Further Reconsidered,* 88 F.C.C.2d at 541 n. 34. In *Computer & Communications Industry,* the court sustained this preemption, holding that "when state regulation of intrastate equipment or facilities would interfere with achievement of a federal regulatory goal, the [FCC's] jurisdiction is paramount and conflicting state regulations must necessarily yield to the federal regulatory scheme." *Computer & Communications Indus.,* 693 F.2d at 214. Thus the court rejected various challenges to the FCC's power to preempt state regulation of CPE. *See id.* at 218.

Powell argues that the $1.25 per call surcharge, identified by the PUC as an equipment fee covering the Safeblock system, is a usage-sensitive charge and as such was not deregulated by the FCC when it unbundled and detariffed CPE charges. His argument is based on a sentence in the first FCC opinion which states that:

> in today requiring equipment to be made available to interstate users on a cost-based non-usage sensitive basis—with equipment investment fully isolated from transmission investment and from the separations process—we hope to strengthen further the prospects for comparing competitive equipment offerings in the market.

*Second Computer Inquiry*, 77 F.C.C.2d at 454.

The PUC held that the fact that the CPE was paid for on a flat fee, per-call basis, rather than on a lump-sum basis, does not change its basic nature. We agree. The above-quoted language does not create an exception that would allow regulation of certain CPE depending upon the method of payment. The FCC's intent was to unbundle CPE from transmission services, remove equipment investment costs from the rate base calculation for transmission services, and foster competition in CPE markets.[10] *See Second Computer Inquiry*, 77 F.C.C.2d at 388, 444. Thus in the above language the FCC was merely distinguishing traditionally usage-sensitive transmission service, priced under a standard rate-of-return analysis, from equipment sales which would thereafter be priced according to market driven, competitive costing mechanisms and no longer included in a utility's rate base calculation. Nothing anywhere in these three voluminous FCC opinions or in the federal court opinion indicates that the FCC meant to preclude deregulation of certain CPE if a provider and its customer chose a payment plan such as the one arranged between Sprint and the DOC. The intent was to ensure that equipment payments were not bundled and tariffed with transmission service and that equipment investment was not calculated as part of a utility's rate base.[11] *See id.* We agree with the PUC that the Safeblock system was CPE and thus was preempted from state regulation by federal law.

### IV. Sprint's InterLATA Tariff

 In the notice of appeal to this court, Powell lists as an issue: "Whether the petitioners challenged the validity of Sprint's basic per-minute rates by alleging Sprint's lack of a certificate of public convenience and necessity, and failure to file tariffs or price lists, for an inmate telephone system." Powell's argument in this regard is not that Sprint's tariffed interLATA rates are unreasonable, that Sprint illegally charged a different rate from that reflected in its tariff, or even that the $1.25 charge [12] and other procedures violated the terms of the existing tariff, but rather that Sprint needed a separate certificate and tariff for inmate phone service and thus all of its charges were illegal. Whether Sprint must file a separate certificate and tariff is certainly an issue over which the PUC has jurisdiction. In this case, the PUC held that no such filing was required. We agree.

As previously discussed, there were two components to Sprint's contract with the DOC. One component consisted of interLATA toll service. Neither Sprint nor the DOC argue that this service is not regulable. InterLATA toll is a Part Three service subject to possible alternative forms of regulation under section 40–15–302(1). *See* § 40–15–301(2)(c), 11 C.R.S. (1997).

Sprint has a certificate of public convenience and necessity to provide interLATA toll service in Colorado, *see* Dec. No. C86–526 (May 6, 1986), and operates under a relaxed regulatory scheme that allows the posting and filing of price lists rather than tariffs. *See* Dec. No. R89–1612 (Dec. 13, 1989).

Powell claims that because Sprint and the DOC did not have a separate certificate, with accompanying tariffs, specifically covering inmate service, all of the charges assessed under the Safeblock system violated section 40–3–105(2) and thus should be refunded to

---

**10.** It was as a result of this separation and deregulation of CPE that consumers began purchasing their phones from various vendors rather than leasing phones from the phone company.

**11.** We recognize that the impetus behind deregulation was to foster competition, and that although Safeblock is deregulated, the inmates do not receive the benefit of choice in a competitive environment. This does not vitiate the policy behind deregulation, however, but results from the fact that inmates are not allowed to shop and contract for the provision of their needs. The

DOC, as part of its Code of Penal Discipline, must grant approval for any contracts entered into by inmates. For obvious practical reasons, inmates are not allowed to contract for their own phone service or other basic needs.

**12.** Powell did claim that the $1.25 charge was illegal because it was not included in the tariff. However, as we have already discussed the $1.25 charge represented an unregulable equipment fee.

the inmates. *See* § 40–3–105(2), 11 C.R.S. (1997)(providing that public utilities shall not charge a "greater or lesser or different compensation for any product or commodity ... or for any service rendered ... than the rates ... specified in its schedules on file and in effect at the time"). Powell, however, cites no authority for the proposition that inmate phone service requires a separate certificate and tariff, and indeed none exists in the statutes or in the regulations.

■ With respect to the second component of Sprint's contract, the Safeblock system, the PUC held that it constituted CPE and thus could not be regulated. This ruling naturally implies that an entity need not, and could not, obtain a certificate and tariff for an unregulated item.

Certificates are required for Part Two regulated services. *See* § 40–15–202, 11 C.R.S. (1997). Additionally, certificates may be required for Part Three emerging competitive services. *See* § 40–15–302, 11 C.R.S. (1997). It scarcely needs emphasizing that no provision, in Title 40 or elsewhere, requires a certificate and tariff for an unregulated service.

Nowhere in the record has Powell challenged the reasonableness of Sprint's price-list rates or claimed that Sprint charged a rate different from that reflected on the price list. Rather, Powell has argued that the operation of Safeblock required a separate certificate and tariff. We agree with the PUC that a non-regulated service does not require a certificate or tariff, and that "inmate phone service," as a separate category, does not require its own certificate and tariff.

## V.

The PUC does not have jurisdiction to review the manner in which the DOC provides phone privileges to inmates. The DOC's activities in connection with securing a phone system for the inmates and promulgating rules for its use, did not convert it into a public utility, either as a telephone corporation or as a provider of telecommunications services. Neither can the DOC be classified as a provider of nonoptional operator service as a reseller of toll service because no opera-

tor service whatsoever is involved in the Safeblock system.

The PUC did not have jurisdiction over the Safeblock system because, regardless of the method of payment, Safeblock constituted CPE which has long been preempted from state regulation by federal law.

The PUC has jurisdiction over one of the two components of Sprint's service to the DOC. Sprint's provision of tariffed inter-LATA toll service is regulated by the PUC, but the inmates do not challenge the reasonableness or accuracy of the tariffed rates. No separate certificate of convenience and necessity for inmate service is required, thus Sprint was not operating in violation of the statute or PUC regulations.

We therefore affirm the district court's decision upholding the PUC's grant of summary judgment to both Sprint and the DOC.