PUBLIC SERVICE COMPANY OF COLORADO, a public utility, Respondent–Appellant,

v.

TRIGEN–NATIONS ENERGY COMPANY, L.L.L.P., a Colorado limited liability limited partnership; Enron Capital & Trade Resources Corporation, a Delaware corporation; Colorado Independent Energy Association, a nonprofit Colorado corporation; and Nicholas Muller, an individual, Petitioners–Appellees,

and

Public Utilities Commission of the State of Colorado, an agency of the State of Colorado; Bruce Smith, in his capacity as Executive Director of the Public Utilities Commission; Robert J. Hix, Vincent Majkowski, and R. Brent Alderfer, in their capacities as Commissioners of the Public Utilities Commission, Respondents–Appellees.

No. 98SA103.

Supreme Court of Colorado, En Banc.

June 28, 1999.

Gorsuch Kirgis LLP, Dudley P. Spiller, Heather Hawker, Paula M. Connelly, Denver, Colorado, Attorneys for Respondent–Appellant.

Kelly Haglund Garnsey & Kahn LLC, James W. Hubbell, Christine L. Murphy, Jeffrey G. Pearson, Denver, Colorado, Attorneys for Petitioners–Appellees.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Anne K. Botterud, Assistant Attorney General, Regulatory Law Section, Denver, Colorado, Attorneys for Respondents–Appellees.

Justice HOBBS delivered the Opinion of the Court.

Pursuant to section 40–6–115(5), 11 C.R.S. (1998), Public Service Company of Colorado

(PSCo) appeals from the final judgment of the District Court of the City and County of Denver (district court) reversing a decision of the Public Utilities Commission (PUC). PUC had granted PSCo's application for approval of five customer agreements for special below-tariff electric rates, under section 40-3-104.3, 11 C.R.S. (1998). In the course of its proceeding, PUC had issued a protective order keeping the names of the five customers confidential and had denied petitions for intervention filed by three prospective parties. The district court set aside PUC's decision approving the five agreements. It determined that PUC should not have allowed redaction of the five customer names when the application and notice of proceeding were made public. It returned the action to PUC for identification of the customer names, reconsideration of the intervention motions, and redetermination of the application for approval of the below tariff agreements. We reverse and reinstate PUC's action.[1]

I.

On August 26, 1997, PSCo filed with PUC a by-pass application under section 40-3-104.3 for authority to provide electric service to five named customers by contract at below-tariff rates. Together with the complete application and supporting customer utility information, PSCo submitted a motion for "extraordinary protection" in accordance with the PUC rules that implement the by-pass statute, in particular, 4 C.C.R. 723-10

exh. 1, para. 1[2] and 4 C.C.R. 723-10-3.4.2 (1994).[3] PSCo requested that the following information be treated as confidential: (1) the identity of the customers; (2) the reason that these customers were offered a contract rate; and (3) the special rate agreements.

PSCo explained its request for confidential treatment of the information under PUC rules as follows:

> Certain customers of Public Service Company have opportunities as a result of industry restructuring to purchase alternate services from another provider. The strategic marketing tactics that Public Service desires be kept confidential could be used by other customers or competitors to offer alternative services to additional customers, thereby increasing revenue loss to Public Service Company.

PUC granted PSCo's motion for protective order. Under PUC rules, confidential information is made available to PUC commissioners, their staff, the Office of Consumer Counsel (OCC), and any parties to the proceeding, see 4 C.C.R. 723-10 exh. 1, para. 2; 4 C.C.R. 723-16-3.7 (1999), but the confidential information is not accessible publicly. See 4 C.C.R. 723-10-3.4.3 (1994). As a result of PUC's protective order, the customer names, the five contracts, the customer notification letters to PSCo, and the written testimony of PSCo's marketing director that explained why it chose to offer below-tariff rates to these five customers, have been kept

---

1. The issues on appeal are:
 A. Whether the District Court for the City and County of Denver ("district court") erred when it set aside the Public Utilities Commission ("PUC" or "Commission") order denying the motion to intervene in PUC Docket No. 97A-364E filed by Trigen-Nations Energy Company ("Trigen") and the Colorado Independent Energy Association ("CIEA")?
 B. Whether Trigen and CIEA lack standing to challenge the Commission's entry of a confidentiality order in PUC Docket No. 97A-364E?
 C. Whether the district court erred when it set aside the confidentiality order entered by the Commission in PUC Docket No. 97A-364E?
 D. Whether the district court erred when it set aside the PUC's order granting Public Service Company of Colorado's application in PUC Docket No. 97A-364E?

2. 4 C.C.R. 723-10 exh. 1, para. 1 provides in relevant part:

 > To the extent there may be information which a party believes requires extraordinary protection beyond that provided for in this Order, the party shall file the information with the Commission, only, under seal together with a motion seeking such extraordinary protection. The motion shall state the grounds for seeking the relief and advise all other parties of the request and the subject matter of the material at issue.

3. 4 C.C.R. 723-10-3.4.2 provides in relevant part: "The applicant shall indicate any information which is claimed to be confidential and shall state the grounds with specificity and cite the legal authority for the claim of confidentiality in a motion for protective order."

under seal throughout the administrative and judicial review proceedings.

Pursuant to section 40–3–104.3(1)(b), PUC ordered that the notice period for the by-pass application be shortened to five days. *See Public Serv. Co.,* No. C97–898 (Public Utils. Comm'n Sept. 3, 1997). PSCo published notice in the Denver Post, and PUC mailed notices to fifty-two potentially interested individuals and organizations, deleting the customer names in accordance with PUC's protective order. The notices stated that PSCo had filed with PUC "an application seeking an order from the [PUC] authorizing it to provide electric service under contract without reference to its tariffs to five Customers who have expressed their intention to pursue purchase of alternative electric services from other providers." PUC made the notice and redacted application available to the public, deleting the customer names and the reasons for PSCo offering below-tariff rates to them pursuant to 4 C.C.R. 723–10–3.4.3. The redacted application recited items of compliance with the by-pass statute but nevertheless kept details of that compliance confidential to PUC and OCC in accordance with PUC's protective order.

In response to the notice, Trigen–Nations Energy Company, L.L.L.P. (Trigen), a qualifying cogeneration facility operator,[4] and the Colorado Independent Energy Association (CIEA), a non-profit corporation formed to advocate interests of non-utility independent electric power generators, timely filed petitions to intervene in the by-pass proceeding. K N Marketing (KNM), a wholesale electric supplier, filed an untimely petition to intervene. PSCo objected to the intervention of all three entities, reasoning as follows:

> Importantly, these Intervenors have admitted that they are competitors of Public Service Company, both currently and in the future. C.R.S. 40–3–104.3 was specifi-

cally enacted to permit the public utility to respond to competition and to offer a confidential contract to customers who have expressed an intention to decline or discontinue or partially discontinue service, to provide their own service, or to pursue the purchase of alternate services from another provider. The competitors of Public Service Company, such as these Intervenors, are the very people who should not be provided this confidential information in order to comply with the letter and the spirit of C.R.S. 40–3–104.3.

OCC intervened in furtherance of its statutory duty to represent the public interest and, in particular, the interests of residential, agricultural, and small business consumers. *See* §§ 40–6.5–104(1) & –106(1)(b), 11 C.R.S. (1998). PUC and PSCo made available to OCC the complete agency record in accordance with section 40–3–104.3(1)(b), which requires OCC to utilize the information confidentially.

OCC requested PUC to set a hearing on the PSCo application. PUC then referred PSCo's by-pass application for hearing to an administrative law judge (ALJ). The ALJ recommended denial of intervention by Trigen, CIEA, and KNM. *See Public Serv. Co.,* No. R97–975 (Public Utils. Comm'n Sept. 26, 1997). On October 1, 1997, OCC moved to withdraw its intervention, explaining that:

> After a thorough review of the application, consideration of the issues in this matter, and discussion with Public Service Company, the OCC hereby withdraws its intervention in this case. The OCC has no objection to Public Service Company's Application as filed in Docket No. 97A–364E.

Trigen and CIEA filed an exception and objection to the ALJ's recommendation denying their intervention, sought a hearing on PSCo's application, and requested rescission of the protective order's prohibition on disclosure of "the identity of the customers in

---

4. As required by the Public Utility Regulatory Policies Act, 16 U.S.C. § 824a–3(f)(1) (1994) (PURPA), PUC adopted rules requiring electric utilities under certain conditions to purchase power from qualifying facilities at full avoided cost whereby the utility sets rates based upon the cost that the utility would have incurred in building its own power plant or purchasing a like

amount of power from a non-qualifying facility. *See* Rules Implementing Sections 201 and 210, PURPA, Small Power Production and Cogeneration Facilities, 4 C.C.R. 723–19–1.207 & –3.401 (adopted 1982 and as amended); *see also Phoenix Power Partners v. Public Utils. Comm'n,* 952 P.2d 359, 361 (Colo.1998).

the application in this matter and other information required by the statute not [to] be concealed."

On October 8, 1997, PUC upheld the ALJ's order denying Trigen, CIEA, and KNM's intervention, granted PSCo's application for approval of the five below-tariff special rate agreements, and placed under continued seal the five customer names, the agreements, the customer notices of intent to PSCo to discontinue service, and PSCo's written testimony regarding its reasons for offering the special rates. *See Public Serv. Co.*, No. C97–1038 at 6–9 (Public Utils. Comm'n Oct. 8, 1997). In denying the third-party motions to intervene, PUC found that Trigen, KNM, and CIEA did not currently serve the five customers and that retail service by them "would likely be unlawful" under the doctrine of regulated monopoly. *Id.* at 7. PUC also found that intervention by these third parties and disclosure of the customer names to them would "likely frustrate the purpose of § 40–3–104.3 by hindering Public Service's efforts to retain utility retail customers in these particular circumstances." *Id.* at 7–8. PUC approved the customer agreements, finding that PSCo's application met all requirements of section 40–3–104.3, in particular, that the "application sufficiently demonstrates that retention by Public Service of these five customers under contract is preferable to losing these customers since these customers will continue to contribute to recovery of system fixed costs." *Id.* at 5–6.

Commissioner Alderfer objected in part to PUC's decision. He called upon PUC to "open a docket to examine the terms and conditions under which competing interests are balanced in the market," reasoning that:

It is both reasonable and desirable to allow a monopoly utility to prepare for competition by responding to customers' needs now. However, if § 40–3–104.3, C.R.S. is to be used to allow the utility to enhance its competitive position in a future deregulated market, the Commission cannot simply ignore the concomitant interests of competitors, customers, and the public in that market. Strengthening the monopoly, while at the same time barring and discouraging response by competitors, does not serve a competitive market, present or future.

*Id.* at 11 (Commissioner Alderfer, concurring in part and dissenting in part).

Upon petition for judicial review of PUC decision pursuant to section 40–6–115, 11 C.R.S. (1998),[5] and section 24–72–204(5), 7 C.R.S. (1998), of the Colorado Public Records Act,[6] the district court ordered that:

The PUC's confidentiality order is set aside to the extent that it protects from disclosure the names of the five customers that are the subject of PSC's by-pass application. PSC and the PUC are directed to forthwith identify those customers with particularity. The PUC's order denying petitioners' motion to intervene is set aside. Petitioners may renew their motion to intervene within 20 days of the date on which the PUC and PSC disclose the names of the five customers who are the subject of the by-pass application. The PUC's order granting PSC's application is set aside and remanded for further proceedings consistent with this order.

The district court made no ruling upon the Public Records Act claim in light of its determination that PUC had violated the by-pass statute by not publishing the customer names. We reverse the district court and, on remand, instruct it to reinstate *nunc pro*

---

5. Section 40–6–115 provides for the means of obtaining judicial review of a PUC decision.

6. Section 24–72–204(5) provides that "[a]ny person denied the right to inspect any [public] record ... may apply to the district court of the district wherein the record is found for an order directing the custodian of such record to show cause why he should not permit the inspection of such record." Trigen, CIEA, Enron Capital Trade Resources Corporation, a customer and potential customer of PSCo, and Nicholas Mul-

ler, Executive Director of CIEA, had requested disclosure of the sealed material under the Public Records Act on November 3, 1997. PUC denied their request on November 6, 1997, whereupon the parties sought judicial review in the district court. Enron and Muller are parties only for purposes of judicial review of the Public Records Act claim, which we do not address in light of our holding affirming PUC's authority for customer confidentiality protection in the by-pass proceeding.

*tunc* PUC's action approving the five customer special rate agreements.

## II.

We hold that PUC acted within its authority to take these actions: (1) grant a protective order keeping confidential the names of the five customers, the other individual customer information, and PSCo's written testimony explaining its reasons for offering the below-tariff rates; (2) deny the third party intervention motions; and (3) approve the five customer agreements, pursuant to section 40–3–104.3 and PUC's implementing rules.

### A.

### *PUC Authority and the Standard of Review*

■ Article XXV of the Colorado Constitution vests in such agency as the General Assembly may designate all power to regulate the facilities, service, rates, and charges of every public utility operating within Colorado. *See* Colo. Const. art. XXV. Through the Public Utilities Law, §§ 40–1–101 to 40–7–117, 11 C.R.S. (1998), the General Assembly has assigned to PUC the authority "to do all things, whether specifically designated in articles 1 to 7 of this title or in addition thereto, which are necessary or convenient in the exercise of such power." § 40–3–102, 11 C.R.S. (1998). Accordingly, PUC has power to accomplish functions delegated to it by the Public Utilities Law and article XXV. *See Mountain States Tel. & Tel. Co. v. Public Utils. Comm'n,* 763 P.2d 1020, 1025 (Colo. 1988); *City of Montrose v. Public Utils. Comm'n,* 629 P.2d 619, 622 (Colo.1981).

■ Section 40–6–115 provides the procedure for obtaining judicial review of a PUC decision. *See Archibold v. Public Utils. Comm'n,* 933 P.2d 1323, 1326 (Colo.1997); *Silver Eagle Servs., Inc. v. Public Utils. Comm'n,* 768 P.2d 208, 214 (Colo.1989). A PUC decision is final and not subject to review, except on the ground that it violates a constitutional or statutory right or duty, whereupon the district court and we, in turn, have responsibility to exercise an independent judgment on matters of law, *see* § 40–6–115(2), with due deference to PUC's fact-finding and policy-making roles. The district court acts to set aside or modify a PUC decision in the event of legal error; otherwise, it shall affirm the agency's action. *See* § 40–6–115(3); *CF & I Steel, L.P. v. Public Utils. Comm'n,* 949 P.2d 577, 585 (Colo.1997).

■ We apply the same standard in reviewing PUC decisions as the district court. *See* § 40–6–115(5); *Office of Consumer Counsel v. Public Utils. Comm'n,* 786 P.2d 1086, 1091 (Colo.1990). A reviewing court may not substitute its judgment for that of PUC when substantial evidence exists to support PUC findings and conclusions. *See Atchison, Topeka & Santa Fe Ry. v. Public Utils. Comm'n,* 194 Colo. 263, 267, 572 P.2d 138, 141 (1977)("We adhere to the proposition that the legislature contemplated that the reviewing court, since it does not have the aid of a staff and the expertise of the PUC, should not undertake to duplicate the evaluation and judgment processes followed by the PUC in arriving at its decision."); *see also Powell v. Public Utils. Comm'n,* 956 P.2d 608, 613 (Colo.1998); *Public Serv. Co. v. Public Utils. Comm'n,* 765 P.2d 1015, 1019 (Colo. 1988); *City of Montrose,* 629 P.2d at 622.

■ In the light most favorable to PUC and based upon the evidence of record, we review PUC's findings and decisions. *See CF & I Steel,* 949 P.2d at 585; *Boulder Airporter, Inc. v. Rocky Mountain Shuttlines, Inc.,* 918 P.2d 1118, 1120 (Colo.1996). PUC acts with the benefit of its considerable expertise; thus, we give deference to PUC interpretations of applicable statutes and regulations, but its interpretations of law do not control the court's conclusion of law. *See Powell,* 956 P.2d at 613; *Boulder Airporter,* 918 P.2d at 1120.

■ In sum, we limit review of a PUC decision to determining whether it has regularly pursued its authority, whether the decision is just and reasonable, and whether the conclusions reached are in accordance with the evidence. *See Powell,* 956 P.2d at 613; *Boulder Airporter,* 918 P.2d at 1121. Whether substantial evidence exists to support a PUC decision is a question of law for judicial

determination. *See Powell,* 956 P.2d at 613; *Boulder Airporter,* 918 P.2d at 1121.

## B.

### *The By–Pass Law*

By allowing a public utility to offer contract rates below the prevailing tariffs for retail electric service in its certificated territory, section 40–3–104.3 provides a means by which a regulated electric, gas, or steam utility may retain existing customers who are contemplating reduction or elimination of their power purchases from it. *See* § 40–3–104.3. These lower-than-standard rates, referred to as load retention rates, function to retain existing customers for participation in the rate base allocation and recovery of fixed and variable costs. *See* Robert L. Swartwout, *Current Utility Regulatory Practice From a Historical Perspective,* 32 Nat. Resources J. 289, 316–17 (1992). The principle is that all customers benefit from lower rates through greater economies of scale when the public utility retains customers, especially large-use customers who may have the ability to reduce or eliminate demand by generating their own power within plant boundaries or by other legal means. PUC has promulgated rules[7] for the implementation of the by-pass law. *See generally* Applications Filed in Accordance with § 40–3–104.3, C.R.S., Concerning the Authority of the Public Utilities Commission to Flexibly Regulate Gas, Electric or Steam Utilities, 4 C.C.R. 723–10 (adopted 1990 and as amended).

Section 40–3–104.3 permits a public utility to request authorization for special rate agreements when PUC finds that: (1) the price of such service is not below that service's variable cost; (2) the customer or potential customer has expressed an intention to decline, discontinue, or partially discontinue service, to provide its own service, or purchase alternate services from another

provider;[8] (3) approval of the application will not adversely affect the remaining customers of the utility; and (4) the application is in the public interest. *See* § 40–3–104.3(1)(a)(I)(A)–(D).

The application filed with PUC must contain: (1) the name of the customer; (2) a description of the services proposed to be provided under contract; (3) evidence that the requirements of section 40–3–104.3 have been met; and (4) any additional information required by PUC. *See* § 40–3–104.3(1)(c); 4 C.C.R. 723–10–3.1 (1994). The utility must file the special rate agreements under seal with PUC. *See* § 40–3–104.3(1)(b) & (e); 4 C.C.R. 723–10–3.4.1 (1994). The regulated utility proposing the special rates must absorb the economic impact of them. *See* § 40–3–104.3(2)(a). Because the utility, not the other customers, sustains the revenue loss, PUC has limited authority to disapprove a special rate agreement: "The [PUC] shall have no authority to disapprove the contract if the contract complies with the [statutory] conditions ... but the commission may consider the contract for general regulatory purposes and to ensure compliance with the requirements of this section." *Id.*

## C.

### *Standing*

■ PSCo asserts that Trigen and CIEA lack standing to challenge PUC's decision to grant the motion for protective order redacting customer names from the publicly available application and from the notice of the proceeding. We disagree.

■ Standing involves determining whether Trigen and CIEA have posited a legal basis for asserting a claim for relief. *See Romer v. Board of County Comm'rs,* 956 P.2d 566, 572 (Colo.1998). To demonstrate standing, one must assert an injury-in-fact;

---

7. Section 40–2–108 grants PUC the authority to "promulgate such rules as are necessary for the proper administration and enforcement" of the Public Utilities Law. § 40–2–108(1), 11 C.R.S. (1998); *accord* § 24–4–103, 7 C.R.S. (1998).

8. Under the present system of regulated monopoly, retail service by another provider in the certificated territory would not be available in the

absence of a PUC certificate of public convenience and necessity. Trigen and CIEA admit in their brief that their business would be limited to providing power to existing PSCo customers who seek to "provide their own services" and become self-sufficient under section 40–3–104.3(1)(a)(I)(B).

this alleged injury must fall within the scope of a legal right protected by the statutory or constitutional provisions asserted to have been violated. *See Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). "The existence of standing necessary to invoke the jurisdiction of our courts depends upon a showing that the action complained of has caused or threatens to cause injury to an interest protected by law." *Romer,* 956 P.2d at 572.

The alleged injury-in-fact must be "sufficiently direct and palpable to allow a court to say with fair assurance that there is an actual controversy proper for judicial resolution." *O'Bryant v. Public Utils. Comm'n,* 778 P.2d 648, 653 (Colo.1989). In the context of agency action, the injury-in-fact element of standing does not require that a party undergo actual injury, as long as the party can demonstrate that the administrative action "threatens to cause" an injury. *Id.* (construing review of consumer action against telephone company); *accord Maurer v. Young Life,* 779 P.2d 1317, 1324 (Colo.1989)(holding that state property tax administrator has standing to appeal Board of Assessment Appeals ruling); *CF & I Steel Corp. v. Colorado Air Pollution Control Comm'n,* 199 Colo. 270, 279, 610 P.2d 85, 92 (1980)(construing suit by electric utility challenging air pollution control regulations).

Having sufficiently alleged injury, the person must also demonstrate that its interests are within the scope of legally protected interests. *See O'Bryant,* 778 P.2d at 653. Although they are not regulated utilities that can provide retail electric service to customers within PSCo's certificated territory,[9] Trigen and the members of CIEA currently provide large commercial electric users with the ability to become self-sufficient through cogeneration facilities operating at the their plants. Thus, Trigen, CIEA members, and those similarly situated are potential competitors of PSCo, at least to a limited extent. They also have an interest in competing against others to sell power to public utilities, such as PSCo, which require additional power to meet demand. Trigen and CIEA argue that the General Assembly intended disclosure of the PSCo customer names; according to this contention, any member of the public, including potential competitors of PSCo, would be entitled to these names. For the purpose of ascertaining whether this is a correct construction of the statute, we recognize Trigen and CIEA's standing to contest PUC's protective order that authorized redaction of customer names from the publicly accessible application and notice proceeding.[10]

## D.

### *PUC's Protective Order*

Trigen and CIEA argue that the bypass statute and PUC rules require customer names to appear in the application and notice made available to the public. We disagree. PUC's authority to keep the customer names confidential derives from statute and implementing rules, as well as its legislative authority to take action necessary or convenient to discharging its constitutionally and legislatively delegated responsibilities. *See* § 40–3–102.

9. PUC issues certificates of public convenience and necessity to utilities in a certificated territory. *See* Colo. Const. art. XXV; § 40–5–101 & – 102, 11 C.R.S. (1998); *City of Greeley v. Poudre Valley Rural Elec. Ass'n, Inc.,* 744 P.2d 739, 745 (Colo.1987). A certificate of public convenience and necessity recognizes a right to service the customers of a certificated region, unless the company is not ready, willing, and able to provide the requested service. *See City of Greeley,* 744 P.2d at 745; *Rocky Mountain Natural Gas Co., Inc. v. Public Utils. Comm'n,* 199 Colo. 352, 355, 617 P.2d 1175, 1177 (1980). "[O]nce an area has been certificated to one utility, it and it alone has the right to serve the future needs of that area provided it can do so. This is essential to the doctrine of regulated monopoly." *Public*

*Serv. Co.,* 765 P.2d at 1021 (quoting *Public Utils. Comm'n v. Home Light & Power Co.,* 163 Colo. 72, 87, 428 P.2d 928, 936 (1967))(emphasis in original omitted).

10. The district court ruled that the name disclosure and intervention questions were so mixed as to be inseparably connected. It reasoned that the customer names would aid Trigen and CIEA in determining what issues they might raise in the by-pass proceeding. Contrary to the district court's view, we conclude that Trigen and CIEA's standing to challenge PUC's confidentiality order and their entitlement to intervene are separate questions.

PUC has rulemaking authority, *see* § 40–2–108, which it has utilized to adopt confidentiality rules applicable to PUC proceedings. Its rules include procedures governing by-pass proceedings. *See generally* 4 C.C.R. 723–10. Agency rulemaking is quasi-legislative in character. Generally, PUC's rules and attached forms provide for public disclosure of customer names, but the rules also allow for protective orders to keep designated information confidential in a particular proceeding, upon motion and order. We presume that agency rules are valid; the person challenging them must prove the invalidity of agency rules beyond a reasonable doubt. *See Colorado Ground Water Comm'n v. Eagle Peak Farms, Ltd.*, 919 P.2d 212, 214–15 (Colo.1996).

Although PUC rules and decisions allowing and governing protective orders are presumptively valid, Trigen and CIEA argue that the by-pass statute countermands the PUC rules and orders in this case by requiring disclosure of customer names. The district court agreed with this argument; it interpreted section 40–3–104.3(1)(c) as requiring that the entire application must be made public. It concluded that redacting the customer names from the notice and application provided to the public "created an untenable catch–22 situation" because Trigen and CIEA could not "determine whether they have a statutory or legally protected interest in the proceeding without knowing the identity of the subjects of the proceeding."

We disagree. Section 40–3–104.3(1)(c) does not state that the entire content of an application, including customer names, must be made public; rather, it requires that the application filed with PUC must contain the customer names and other specified information. PUC rules set forth the process for redaction of confidential from non-confidential information. *See* 4 C.C.R. 723–10–3.4 (1994) & exh. 1; *see generally* 4 C.C.R. 723–16. It devolves upon the applicant to convince PUC under its rules that

certain information contained in the application should be afforded confidential treatment. *See* 4 C.C.R. 723–10–3.4 (1994) & exh. 1, para. 1; 4 C.C.R. 723–16–3.1 to 3.2 (1999). If an applicant contends that any portion of the application, prefiled testimony, or exhibits is confidential, "it shall file six copies of the application, prefiled testimony and exhibits without the asserted confidential information, together with the motion for protective order. This information will be available to the public immediately." 4 C.C.R. 723–10–3.4.3 (1994).[11]

Trigen and CIEA argue that legislative history supports their view that the General Assembly intended to require publication of the customer names. They contend that the initial by-pass bill introduced in the House of Representatives provided: "Any application or contract submitted pursuant to this section shall be filed under seal and treated as confidential by the commission." H.B. 92–1243, 58th General Assembly, 2nd Reg. Sess. (Colo.1992). The House Business Affairs and Labor Committee struck the words "application or." *See* H.B. 92–1243, 58th General Assembly, 2nd Reg. Sess., Business Affairs and Labor Committee (Colo.1992). From this, Trigen and CIEA conclude that the General Assembly required the entire content of the application to be made public. We do not view this legislative history argument to be persuasive.

In adopting the by-pass legislation, the General Assembly did not provide that the names or other content of an application must always be made public; rather, it required that the application filed with PUC and made available to OCC must contain all the customer and utility information that justifies approval of the special rate agreements:

> *An application filed* by a public utility pursuant to this section *shall contain the name of the customer,* a description of the services proposed to be provided under

**11.** PUC rules extend protection to "trade secret, confidential, commercial, and financial information" in the proceeding. 4 C.C.R. 723–10 exh. 1, para. 1; *accord* 4 C.C.R. 723–16–3.1 (1999). Confidential protection for commercial information is also set forth in section 24–72– 204(3)(a)(IV), 7 C.R.S. (1998), of the Public Records Act. Parties may utilize the information for purposes of the by-pass proceeding, but they cannot reveal such information outside of the proceeding.

contract, evidence that the requirements of paragraph (a) of this subsection (1) have been met, and any additional information required by the commission.

§ 40–3–104.3(1)(c) (emphasis added). The legislature left unaffected PUC's authority to respond to requests for protective order under its rules.

PUC found disclosure of the customer names to be antithetical to the legislature's authorization for a proceeding whose essential purpose is to by-pass competition.[12] We afford deference to PUC factual findings and its interpretation of enabling statutes and rules, but decide matters of law de novo. *See Powell*, 956 P.2d at 613; *CF & I*, 949 P.2d at 584–85. Here, PUC found that disclosing the customer names would reveal PSCo's strategic marketing decisions, encourage other customers to demand discounts with further rate loss, and conflict with the customer retention purpose of the by-pass statute. After reviewing the material that PUC kept under seal, we are satisfied that it did not abuse its discretion in ruling that disclosure of the customer names would jeopardize the existing customer/utility provider relationship that the legislature intended to favor through adoption of the by-pass statute. We therefore uphold PUC's protective order.

### E.

*PUC's Ruling on the Intervention Motions*

Trigen and CIEA argue that PUC abused its discretion in denying their requests for permissive intervention. They requested intervention as members of the public interested in compliance by PUC with public disclosure requirements and as potential competitors to PSCo. Trigen and CIEA are members of the public and po-

tential competitors of PSCo, but the statute does not anticipate their participation as such in the proceeding.

Under the by-pass statute, OCC represents the public interest; it is legislatively authorized to conduct an in-camera inspection of the confidential information to ascertain compliance with the statutory criteria for protection of the public interest. *See* § 40–6.5–104(1). OCC may argue and present evidence to PUC opposing the special rate agreements if it believes that they are not in the public interest. Here, OCC had all the PSCo and customer materials available to it and, upon review, determined to withdraw its intervention.

Trigen also posited intervention on its competitive interest in "undertaking to supply the electrical and thermal needs of other businesses in Colorado. Such businesses could presently be retail electric customers of Public Service Company.... In that sense, Trigen–Nations is a competitor of [PSCo] for retail electric business." Trigen's expressed concern was that section 40–3–104.3 "not be used by PSCo in a manner that curtails development of retail electric competition at such future time as electric deregulation occurs in Colorado."[13] It added that "[s]hould information in PSCo's application that is currently being kept secret end up being disclosed, Trigen–Nations may be able to articulate additional specific interests in this matter." Likewise, CIEA articulated intervention upon its role as an advocate for independent power generators in Colorado, especially those members that "desire to sell electric power to [PSCo] or to retail electric customers of [PSCo] in the future, either as qualifying facilities or otherwise." CIEA asserted that, upon disclosure of the customer names, "CIEA may be able to state that it

---

**12.** The General Assembly titled the by-pass statute: "Manner of regulation – competitive responses." § 40–3–104.3.

**13.** Despite the interests of Trigen and CIEA in the possibility that the General Assembly will deregulate the state's retail electric utility market in the future, Colorado has been and presently remains a regulated monopoly in the field of utilities since 1913. *See Public Serv. Co.*, 765 P.2d at 1021; *Western Colorado Power Co. v.*

*Public Utils. Comm'n*, 159 Colo. 262, 271, 411 P.2d 785, 790 (1966). The General Assembly has established an electric advisory panel to study the issues involved in retail competition and to "assess whether restructuring of the retail electric industry is in the best interest of all classes of Colorado electricity consumers and the state as a whole." § 40–4–113(2)(a), 11 C.R.S. (1998). The report shall be submitted to the General Assembly by November 1, 1999. *See id.*

has other and further direct interests in the subject matter of the application."

 Requests for intervention are subject to PUC's statute and rules. Section 40-6-109(1) creates two classes of intervenors who may participate in PUC proceedings: (1) those who may intervene as of right and (2) those whom PUC permits to intervene. *See Yellow Cab Coop. Ass'n v. Public Utils. Comm'n*, 869 P.2d 545, 550 (Colo.1994); *RAM Broad. of Colorado v. Public Utils. Comm'n*, 702 P.2d 746, 749 (Colo.1985); *De Lue v. Public Utils. Comm'n*, 169 Colo. 159, 164, 454 P.2d 939, 941–42 (1969). Trigen and CIEA sought permissive intervention. PUC Rule 64 provides that where a party has "a substantial interest in the subject matter of the proceeding," PUC may deny or grant the intervention in its discretion. 4 C.C.R. 723-1-64(b)(1)(1993); *accord RAM Broad.*, 702 P.2d at 749. "Only entities who possess the requisite interest in or are affected by PUC proceedings may intervene in those proceedings." *Yellow Cab Coop. Ass'n*, 869 P.2d at 552. Those parties with a requisite substantial interest in the proceeding would include "any public utility then providing electric ... service in the state of Colorado to the customer." § 40-3-104.3(1)(b). PUC maintains discretion to grant or deny petitions for permissive intervention. *See* 4 C.C.R. 723-1-64(b)(1)(1993); *see, e.g., De Lue*, 169 Colo. at 165, 454 P.2d at 942 (upholding PUC finding that party did not show substantial interest in subject matter and its intervention would unduly broaden the issue before PUC).

PUC found and concluded that neither Trigen nor CIEA had "a substantial interest in the subject matter of the proceeding" within the contemplation of the by-pass statute or PUC's intervention rules. 4 C.C.R. 723-1-64(b)(1). PUC upheld the ALJ's recommendation to deny intervention in light of its finding and conclusion that the primary purpose of the by-pass statute was to enable the regulated monopoly to retain customers in the face of competition, whereas Trigen and CIEA's primary purpose in seeking intervention was to utilize the proceeding in aid of its competitive interests. In its order, PUC reasoned that "Trigen–Nations and CIEA's apparent motive for intervening in this matter

(i.e., to promote their efforts to compete against Public Service in the provision of electric service to retail customers) is directly contrary to the purpose of § 40-3-104.3." (Parenthetical in original). PUC pointed out that "the provision of electric service by petitioners to retail customers in Public Service's certificated territory would likely be unlawful."

 We conclude that PUC did not abuse its discretion in denying the intervention requests. The doctrine of regulated monopoly seeks to protect the interest of the public by affording protection against competition in return for submission to the state's authority for regulation of rates and conditions of service. *See Public Serv. Co.*, 765 P.2d at 1024; *Donahue v. Public Utils. Comm'n*, 145 Colo. 499, 505, 359 P.2d 1024, 1027 (1961). PUC's regulatory powers and duties "are aimed primarily at the protection of consumers who have little or no choice in the selection of their provider because the utility enjoys monopoly status." *CF & I Steel*, 949 P.2d at 584.

> Under the prevailing norms of utility regulation, rates are to be set at a level that covers the utility's legitimate costs and expenses in providing service to the public and a reasonable rate of return on its investment. Accordingly, the primary matters for PUC determination in the public interest are: (1) sufficiency of the rates to recompense the utility and maintain its operational viability for the purpose of serving the public; and (2) distribution of the revenue requirement between the various customer classes in a just and reasonable manner.

*Id.* The by-pass statute forwards Colorado's law of regulated monopoly by excluding potential competitors of the utility from viewing the special rate agreements that PUC, its staff, and OCC may review in connection with the merits of the utility's special rate application. In addition to OCC's intervention, the by-pass statute anticipates intervention by public utility providers who currently serve customers to whom the regulated utility offers the special rate contracts. The statute in this regard reads that "any public utility then providing electric, gas, or steam

service in the state of Colorado to the customer" may participate in the by-pass proceeding. § 40–3–104.3(1)(b).

Because they do not currently provide service to the five customers and because they are potential competitors, at least to the limited extent of providing cogeneration within the customers' plants, Trigen and CIEA appear to be among those whom the General Assembly presumed would be excluded from participating in the special rate proceeding. This is because the special rate proceeding involves comparing the existing tariffs to the special rates contained in the agreement between the existing customer and the regulated monopoly, in order to ascertain whether the special rates are above the fixed and variable costs and whether the testimony supports the fact that the existing customer has expressed its intent to discontinue service. This is the information contained in the customer agreements and accompanying testimony which the statute contemplates will be available only to PUC and its staff, OCC, and utilities currently serving the customer.

PUC found that participation by potential competitors in the proceeding would only serve to damage PSCo's relationship with existing customers and interfere with the intended purpose and efficacy of the legislature's by-pass law. We conclude under the circumstances that PUC acted within its discretion to deny Trigen and CIEA's intervention requests.

### F.

*District Court's Order Setting Aside PUC's Approval of the Special Rate Agreements*

We agree with PSCo that the district court erroneously set aside PUC's decision to grant PSCo's by-pass application. PUC found that PSCo had met the mandatory elements of section 40–3–104.3:

First, the Application and its attachments demonstrate that the price Public Service will charge under these five Electric Service Agreements will be above the Company's variable costs. Second, the applica-

tion, the attachments, and the supporting testimony demonstrate that these five customers have expressed an intention to decline or discontinue, or partially discontinue service, or to pursue the purchase of alternate services from another provider. Third, Public Service's compliance with the provisions of § 40–3–104.3(2)(a), C.R.S. (Commission shall specify a fully distributed cost methodology to segregate rate base, expenses, and revenues associated with services provided under contract), will ensure that remaining customers on the Company's system will not be adversely affected by the granting of this application. . . . Finally, the application sufficiently demonstrates that retention by Public Service of these five customers under contract is preferable to losing these customers since these customers will continue to contribute to recovery of system fixed costs. For these reasons, we have determined that the application should be granted.

Because we uphold (1) PUC's protective order redacting the customer names from the publicly available application and notice of proceeding and (2) PUC's denial of intervenor status to Trigen and CIEA, the district court's basis for setting aside PUC's action in this case lacks authority.[14]

### III.

Accordingly, we reverse the judgment of the district court and remand this case with directions to reinstate PUC's action approving the special rate agreements for the five customers *nunc pro tunc*.

Justice SCOTT does not participate.

---

**14.** We do not reach the Public Records Act issue under section 24–72–204(3)(a)(IV) and imple-

menting regulations and orders because PUC has power to keep the customer names confidential.